DA 09-0112

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2010 MT 137

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ANNE MARIE STOUT,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-07-94
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Koan Mercer, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

            George H. Corn, Ravalli County Attorney; T. Geoffrey Mahar,
William Fulbright, Deputy County Attorneys, Hamilton, Montana

Submitted on Briefs:  March 3, 2010

Decided:  June 22, 2010

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Anne Marie Stout (Stout) appeals from her conviction and life sentence for the crime of deliberate homicide arising from the death of her husband Bill. We affirm the conviction and life sentence.

¶2 Stout presents the following issues for review:

¶3 Issue One: Whether the District Court properly allowed the expert reports that had been admitted into evidence into the jury room during deliberations.

¶4 Issue Two: Whether the District Court properly admitted evidence at trial concerning Stout's attempts to falsely implicate another woman in a campaign to harass and intimidate Stout's husband and family.

¶5 Issue Three: Whether the District Court properly admitted opinion testimony from a police officer concerning blood evidence at the scene.

¶6 Issue Four: Whether the District Court erred in refusing to suppress evidence seized under the authority of a search warrant from a motorcycle saddlebag.

¶7 Issue Five: Whether the District Court had jurisdiction to order that the sentence be modified after conclusion of the appeal to include reimbursement for costs of appellate counsel.

## BACKGROUND

¶8 Bill and Anne Stout lived in a rural area near Darby, Montana, with their two teen-aged sons, one of whom was attending college out of state. Bill died in their home from a single gunshot wound to the head on June 9, 2007, between 10:00 p.m. and midnight.

2

Anne and Bill had been alone in the house that evening until their younger son returned home about midnight. Bill planned to go horseback riding with a friend the next day, and at about 10:00 p.m. talked to the friend by phone about the outing. Stout claimed that she spent the night of June 9 with Bill in their bedroom and that he was not feeling well the next morning. When Bill's friend called the next morning about the ride, Stout told him Bill was ill and was not going to go.

¶9 On June 10, Stout and the younger son drove to Missoula for a shopping trip, returning home late in the afternoon. The younger son did not see his father the prior evening, or before leaving for Missoula with Stout the next morning. She and the son arrived home from the shopping trip to find Bill's body in bed. She called 911 about 4:30 p.m.

¶10 The murder weapon was a pistol owned by Bill. Ten days before his death he reported to the Ravalli County Sheriff that the pistol, holster and ammunition were missing. Ambulance personnel and officers who responded to the 911 call from Stout confirmed that Bill was dead and that no gun was found in the room with him. Officers applied for and obtained a search warrant. The gun was subsequently located in the saddlebag of Bill's motorcycle in the garage of the house. The holster was found in a laundry hamper under washed but wet clothing, and the ammunition was found on top of Bill's gun safe. Three rounds were missing from the center of the box, so that unless the box was completely opened it appeared upon opening from the end that it was full.

¶11 Officers found what appeared to be a laundry washing project that was never finished. Wet laundry, smelling strongly of bleach, was in the hamper but had not been

3

dried. A neighbor whose window faced Bill and Anne's house reported seeing lights on in the bedroom area in the middle of the night, on the night before Anne and the son went to Missoula. The neighbors felt that seeing the light on at that time and location was unusual.

¶12 The bullet that killed Bill and the spent shell casing were recovered from the bed where he was found. A spent shell casing from the pistol was found in the yard, and an un-fired round was in the chamber of the pistol, accounting for the three rounds missing from the ammunition box. Expert botanical examination of a plant blossom found in the ammunition box showed it came from a bush in the yard that had first bloomed for the season at least six days after Bill reported the gun missing. Expert analysis showed that the two spent shell casings came from Bill's gun, as did the bullet that killed him. Stout testified that she did not know anything about the blossom in the ammunition box, but that she assumed that the expert's analysis of it was correct. At the time of the search both Stout and her son told officers that Bill's gun was missing.

¶13 The search also revealed a latex glove imbedded with gunshot residue on the outside and Stout's DNA on the inside. The glove was located in the same laundry hamper as the holster and wet laundry, but Stout testified that she did not know how her DNA got inside the glove. She later testified that she often used rubber gloves around the house, which would explain her DNA, but that she still had no idea how gunshot residue got onto a glove with her DNA in it. Stout testified that she had nothing to do with the gun or the holster and did not know how they ended up in the locations where officers

4

found them.   Investigating officers recovered no fingerprints from the gun or ammunition.  There was no gunshot residue on Bill's hands.

¶14    The search also revealed a note in Stout's handwriting in her nightstand that contained apparent instructions on how to fire a pistol like the one used in the crime.  She claimed that the note was actually a guide for their college-age son for using the clothes washer.   Her computer showed 56 internet searches for such topics as how to kill someone, how to poison someone and get away with it, and how to put a person to sleep.  Stout testified that she believed that these were Bill's searches and showed that he planned to commit suicide.  Stout was the beneficiary of a $500,000 term life insurance policy that Bill had taken out two years before his death, and was co-owner of their real estate with equity over $500,000.

¶15    The investigation also revealed that during a 2005 trip to Arkansas, Bill had a brief affair with a woman he had known years before named Barbara Miller.  Bill and Miller continued to communicate after Bill returned to Montana, and he bought a plane ticket for her to fly into Kalispell, Montana, although that trip and meeting never happened.  Miller testified that she and Bill had discussed getting married and that she planned to move to Montana when that happened.

¶16    Stout later found out about the relationship between Bill and Miller through a phone call from a female person who Stout said she did not recognize. She had a confrontation with Bill over the affair and he agreed to terminate contact with Miller.  Shortly thereafter (still in 2005), Bill, Anne, their sons, and a number of their friends began receiving emails or letters postmarked in Arkansas purporting to be from Miller or

5

from Miller's daughter. The communications deprecated Anne Stout, touted the relationship between Bill and Miller and claimed that it was an ongoing affair. They claimed that Miller was pregnant with Bill's child, and claimed that Miller was going to move to Montana to take Anne Stout's place in the family. The communications claimed that Miller was going to bring Bill's baby to Montana. Other communications, including letters postmarked in Arkansas, purported to invite the family and friends to a barbecue in Montana to celebrate the relationship between Bill and Miller. Bill reported the purported Miller harassment to law enforcement in Ravalli County. Stout told a number of people about Bill's relationship with Miller, and it was a source of intense shame and embarrassment for him. These purported communications from Miller continued sporadically until June, 2006. None of the communications ever went to members of Stout's family.

¶17    The investigation showed that the email accounts from which the purported Miller messages were sent were created on Stout's work computer, and that some of the emails had been sent from her home computer. Investigators were able to duplicate a Ft. Smith, Arkansas postmark like the ones found on letters purporting to be from Miller by mailing a stamped and addressed letter in a manila envelope from Hamilton, Montana to the postmaster in Ft. Smith, Arkansas. During the search immediately after Bill's death in 2007, officers found two letters with Arkansas postmarks in Anne's car in the garage, one sealed and one un-sealed, like the others that had started appearing in 2005.

¶18    Stout's was the only DNA found on the adhesive of an envelope postmarked from Arkansas, purporting to be from Miller and inviting Bill's work partner to the barbecue.

6

The sealed Ft. Smith, Arkansas envelope found in Stout's car during the search contained printed-out emails purporting to be from Miller. Those print-outs contained Stout's fingerprints and palm print. She testified that she did not dispute that her DNA was on the adhesive of the Arkansas envelopes but that she had no idea how it got there. She testified that she could have unknowingly handled the contents of the Arkansas mailings because she sometimes helped Bill with paperwork. During the search after Bill's death, officers found in the Stouts' bedroom a copy of a purported invitation to the barbecue addressed to their sons. Handwriting on the invitation, purportedly from Miller in Arkansas, was identified as Stout's by handwriting analysis, to a high probability.

¶19 In addition to the mailings and emailings, there were several acts of petty vandalism such as eggs or feces smeared on Bill's truck and broken potted plants on the porch of the house. Bill and Anne reported receiving numerous hang-up phone calls. The subsequent investigation showed that those calls had been made from a pay phone in the hall of the business where Stout worked. Bill also reported that a credit card and some financial information were missing from the house and stated that he feared that Miller had come to Montana and had broken in. Bill received emails purporting to be from Miller stating that she was going to come to Montana, and reported his fears about Miller to the sheriff's office. Investigating officers found no evidence that Miller ever came to Montana prior to testifying at Stout's trial.

¶20 As recently as seven months before Bill's death, Stout conducted internet searches related to Miller and to Bill on her work computer and used that computer to create an online account in Miller's name. Stout and Miller also periodically talked by phone in

7

conversations initiated by Stout. She also called and emailed Miller's boss about the affair, and Miller became concerned that she would lose her job if Stout obtained a restraining order against her as Stout threatened. Stout testified that she never sought a restraining order against Miller and never told anyone that she had. Other witnesses testified that she had told them about a restraining order. As recently as six months before Bill's death, Stout called Miller to report that she was divorcing Bill. Miller concluded that Stout was very angry about Bill's relationship with her.

¶21 Shortly after Bill's death, Stout and her two sons named Miller to investigating officers as a person who had an affair with Bill and who had been stalking the family. Stout told officers that Miller's harassment was a great concern to Bill and that not long before his death he believed that a car that turned into their driveway during the night was Miller or one of her family members. Acquaintances of Bill also told officers about the purported Miller stalking, having heard about it repeatedly from Stout. Miller was eliminated as a suspect based upon a store surveillance video that showed that she was in Arkansas at about the same time that Bill was shot.

¶22 A central theme of the prosecution was that Stout deliberately and methodically created the illusion, beginning in 2005 and continuing up until the investigation of Bill's death, that the family had been victimized and stalked by Miller.

¶23 Stout testified that she never made the phone calls that Miller reported, that she never sent mailings to anyone with Arkansas postmarks, that she had no idea how her DNA got onto the envelopes, and that she never created any of the purported Miller emails traced to her computer. She testified that after she found out about the Miller

8

affair she discovered that Bill had bought an airline ticket for Miller to come to Montana; that Bill and Miller were talking by phone; that Bill had bought phone calling cards she did not know about; that Bill had registered with an on-line dating service in 2004; and that Bill had obtained a post office box that she did not previously know about. She testified that she was angry and humiliated. Investigating officers found a list Anne had kept, apparently for years, of all the "really mean things" Bill had ever said to her.

¶24 Stout was charged by information with deliberate homicide on June 26, 2007. She presented expert testimony that the circumstances of Bill's death were consistent with either suicide or homicide. After a three-week trial, a jury found her guilty in June, 2008. The District Court committed her to prison for life in September, 2008.

## DISCUSSION

¶25 *Issue One: Whether the District Court properly allowed the expert reports that had been admitted into evidence into the jury room during deliberations.*

¶26 At the conclusion of the evidence and closing arguments, the trial judge and attorneys met to organize the several hundred pieces of evidence that had been admitted during the trial and to resolve any issues of which exhibits could be taken into the jury room during deliberation. There was no objection from either side to sending the vast majority of the exhibits with the jury during deliberations. This Court reviews a district court's decision on exhibits that may be taken to jury deliberations for an abuse of discretion. *State v. Bales*, 1999 MT 334, ¶¶ 12, 25, 297 Mont. 402, 994 P.2d 17.

¶27 The record of these discussions shows that the District Court excluded several exhibits from the jury deliberations upon objection by the defense. For example, the

defense successfully objected that a photograph that a witness had marked during testimony placed undue emphasis on that witness and should be excluded in favor of an un-marked copy of the same image. The defense successfully excluded two drawings done during testimony by prosecution experts on the ground that they had been admitted "just for demonstrative purposes." At the same time the defense argued that the audio recordings of several witness interviews that had also been transcribed should be given to the jury. The prosecution and District Court agreed and the recordings went with the jury.

¶28 The defense objected to Exhibits 226 through 238, characterized as "various reports from the laboratories" on the ground that allowing the jury to see the reports would put "undue emphasis" on them or the witnesses. Each of the exhibits had previously been admitted into evidence. The only report the defense specifically objected to was the "Autopsy Report," but only to the extent that it contained the conclusion that Bill's death was a homicide. The District Court concluded that there was no "unfair prejudice" in sending the reports with the jury, and that the homicide conclusion in the autopsy report was "made clear in testimony, so it's no surprise."

¶29 Stout contends that the expert reports were "testimonial evidence" that should have been excluded from jury deliberations. She does not contend that the reports were erroneously admitted into evidence during the trial. When jurors retire for deliberation, they may take with them "all exhibits that have been received as evidence in the cause that in the opinion of the court will be necessary." Section 46-16-504, MCA. At the same time, this Court has recognized the common law rule against submission of

10

"testimonial materials" to the jury for "unsupervised and unrestricted review." *State v. Herman*, 2009 MT 101, ¶ 38, 350 Mont. 109, 204 P.3d 1254. That rule applies both as to materials sent with the jury at the start of deliberations, and to requests from the jury to re-hear testimony during deliberations as provided in § 46-16-503(2), MCA. *Bales*, ¶ 23. A district court's decision under § 46-16-504, MCA, on evidence that may be taken by the jury during deliberations is reviewed for abuse of discretion. *Bales*, ¶ 24.

¶30 This Court has tended to identify "testimonial materials" for purposes of the common law rule by analogy. In *Bales*, ¶ 16, we quoted a definition of the phrase "testimonial evidence" from Black's Law Dictionary. The current Ninth Edition of that work defines "testimonial evidence" as a "person's testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness. Also termed communicative evidence; oral evidence." *Black's Law Dictionary* 640 (Bryan A. Garner ed., 9th ed., West 2009). Therefore for purposes of this rule, the terms "testimonial materials" and "testimonial evidence" have been treated as equivalents.

¶31 Further illustration of the intent and meaning of these terms comes from the cases in which this Court has considered issues of what materials can be provided to a jury during deliberations. The disputed testimonial evidence in *Bales* was the tape recording of a police interview with a defendant. Similarly, in *Herman* the disputed testimonial evidence was the written statement by a witness; in *State v. Mayes*, 251 Mont. 358, 825 P.2d 1196 (1992), it was a tape recording of witness statements; in *State v. Morse*, 229 Mont. 222, 746 P.2d 108 (1987), it was a surveillance tape record of the defendant; and in

11

*State v. Harris*, 247 Mont. 405, 808 P.2d 453 (1991), it was the entire transcript of the victim's testimony.

¶32    Stout asserts that expert witness reports admitted into evidence in her case were testimonial evidence that should have been excluded from jury deliberations by the common law rule noted above. However, Stout fails to provide anything more than conclusory contentions that the expert witness reports in her case constituted "testimonial evidence" as that phrase has been defined and as it has been applied in case law. She really only argues that the exhibits relate to and are consistent with testimony from various State witnesses. That, of course, would be true for most pieces of evidence admitted in most trials and forms no basis for excluding items of evidence from the jury deliberations. This is no ground for error. Nevertheless we have reviewed the State's exhibits that she complains about and conclude that none of them is testimonial materials or testimonial evidence for purposes of the common law rule.

¶33    State's Exhibits 226, 227, 228, 229, 231, 232, 236, and 238 are brief laboratory reports, most of them a single page, from the Forensic Science Division of the Montana Department of Justice, commonly referred to as the "State Crime Lab." The reports briefly and summarily list technical and scientific facts resulting from the examination of evidence relating to the prosecution. Exhibit 230 is a longer report from a laboratory in Florida concerning the results of various DNA tests of evidence such as the Arkansas envelopes and the rubber glove. Like the Forensic Science Division reports, the DNA report lists and summarizes the technical and scientific facts resulting from the examination of evidence potentially containing DNA residue. Exhibits 233 and 234 were

12

investigative reports written by Deputy Wagner of the Cascade County Sheriff's Office concerning his examination of and conclusions about the handwriting found on one of the Arkansas mailings. Exhibit 237 was a one-paragraph letter from the Assistant Herbarium Curator at the University of Montana tentatively identifying some of the plant material found in the box of ammunition for the pistol.

¶34    Exhibit 235 was the report of the postmortem examination (autopsy) of Bill's body. This is the only exhibit that Stout specifically objected to during the exhibit conference at the end of the trial. At that time Stout contended that she was prejudiced by the exhibit, but only by the line "at the very end" of the report that said "Manner of Death: Homicide." The District Court allowed the exhibit to go to the jury because the conclusion was consistent with the author's testimony and was "no surprise."

¶35    The author of each of the reports testified and was cross-examined at trial. The defense either stipulated to or did not contest the expert qualifications of each of the witnesses. The jury was instructed on its power and duty to evaluate the testimony of each witness and to determine the weight it should be given. The jury was instructed specifically that expert testimony should be given the weight it deserves, and may be entirely rejected if the reasons given to support it are unsound. Trial court judges are given broad discretion to determine which exhibits would be necessary to help the jury in deciding the case. The District Court did not err by allowing these reports to accompany the jury during deliberation.

¶36  *Issue Two:  Whether the District Court properly admitted evidence at trial concerning Stout's attempts to falsely implicate Miller as the source of a campaign to harass and intimidate Stout's husband and family.*

¶37  Stout contends that the District Court improperly admitted evidence of her campaign to create the illusion that Miller was stalking and harassing Bill and the family. She contends that the evidence was not related to any fact in dispute, and was inadmissible because the events did not occur immediately prior to the charged offense. This Court reviews rulings on the admissibility of evidence to determine whether there has been an abuse of discretion. *State v. Paoni*, 2006 MT 26, ¶ 13, 331 Mont. 86, 124 P.3d 1040.

¶38  The State contends that the Miller evidence is admissible under § 26-1-103, MCA, referred to as the transaction rule. It provides:

> Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction.

The transaction rule allows admission of evidence of acts that are "inextricably or inseparably linked to," *State v. Lacey*, 2010 MT 6, ¶ 31, 355 Mont. 31, 224 P.3d 1247, and are explanatory of the charged offense, *State v. Derbyshire*, 2009 MT 27, ¶ 41, 349 Mont. 114, 201 P.3d 811. The rule is based upon the premise that it is difficult to subdivide a course of conduct into discrete criminal acts and "other" conduct, as it is difficult for a witness to testify coherently about an event if the witness is only allowed to reference minutely defined elements of the crime. *State v. Guill*, 2010 MT 69, ¶ 27, 355 Mont. 490, __ P.3d __. The rule allows admission of evidence that is necessary to

14

"provide a comprehensive and complete picture of the commission of a crime." *Guill*, ¶ 36. All Federal circuits recognize the legitimacy of admitting properly limited relevant evidence that is intrinsic to or inextricably intertwined with a charged crime. *Guill,* ¶ 28.

¶39    We have cautioned that the transaction rule should not be used to admit evidence of other crimes, wrongs or acts to "prove the character of a person in order to show action in conformity therewith" as prohibited by Rule 404(b), M. R. Evid. *State v. Barosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776, without following the requirements explained in *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991). Application of the transaction rule should not be used to avoid Rule 404 and the notice and instruction requirements it specifies. *Guill*, ¶ 26.

¶40    Stout first argues that the evidence of her campaign to make it appear that Miller was stalking the family was inadmissible because it did not happen "immediately prior" to Bill's murder. The phrase "immediately prior" is found in several decisions from this Court, in passages explaining the theory and purpose of the "transaction rule." It appears to have first been used in *State v. Moore*, 254 Mont. 241, 246, 836 P.2d 604, 607 (1992), and was adopted from a Texas case, *Cruz v. State*, 645 S.W.2d 498 (Tex. App. 1982). The disputed evidence in *Moore* involved acts by the defendant after the crime.

¶41    The use of the phrase "immediately prior" in cases explaining the transaction rule is not a substantive temporal limitation on evidence admissible under the rule. We have never held that evidence admissible under the rule is limited to evidence of acts occurring immediately prior to the crime. *See e.g. State v. Bauer,* 2002 MT 7, 308 Mont. 99, 39 P.3d 689. Adoption of such a narrow interpretation would reward the plodding and

15

methodical criminal who is capable of planning her crime over a span of months or years. The ability to do so should not be rewarded by excluding the evidence. The issue under the transaction rule is whether the evidence is inextricably linked to and explanatory of the crime. The issue is not whether the acts occurred immediately prior to the crime or at some other time.

¶42 Moreover, contrary to Stout's characterization, her campaign to paint Miller as a dangerous stalker was not an isolated incident that occurred two years before the crime. While the campaign began in 2005, it was continuing up until the moment of Bill's death and afterwards. Within months before Bill's death, Stout had created another internet account in Miller's name. She had done internet searches involving Bill and Miller. She called Miller and told her she was divorcing Bill. Copies of the spurious emails and letters that were part of the campaign were found in Stout's car during the search after the murder. When investigating officers interviewed Stout, she and her sons named Miller as someone with whom Bill had trouble. Stout's plan did not stop in 2005 but continued up to and after the murder.

¶43 Second, Stout argues, very briefly, that the harassment evidence was inadmissible because it was not related to any fact in dispute, as required by the transaction rule. She contends that evidence of a campaign in 2005 to embarrass her husband about the affair was not evidence of the murder.

¶44 The prosecution's theory of the case was that Stout became enraged by the affair and Bill's apparent plan to divorce her and take up with Miller. In reaction to her anger she manufactured the Miller harassment campaign to embarrass both Bill and Miller.

16

Stout's anger with Bill caused the events that eventually led to the murder, and the manufactured perception that Miller had harassed the family could ensure that Miller would be the suspect in the crime. This plan worked. Stout and both her sons told investigating officers immediately after Bill's death that Miller had been stalking the family. Officers investigated Miller as a suspect. Had she not coincidentally appeared on a store surveillance video in Arkansas at the time of the murder, Stout's plan to drag a red herring across the trail of the investigation could have lasted much longer.

¶45 Stout's efforts to paint Miller as a deranged stalker and murder suspect were clearly an integral part of her planning of the crime. Stout could not act on her anger toward Bill until she sufficiently indoctrinated everyone involved, including Bill and her sons, to the belief that Miller was a threat to them. She did this thoroughly and precisely. It was part of her planning of the crime itself and was clearly inextricably linked to her role in Bill's death. The evidence that Stout manufactured the harassment campaign to implicate Miller was not evidence of "other" crimes, acts or wrongs, and thus M. R. Evid. 404(b) is not implicated. It was evidence of the crime itself and provided the essential context to prove to the jury how and why the crime occurred.

¶46 Contrary to the suggestion by the dissent, use of the transaction rule in this manner does not allow prosecutors to seek victory at the expense of a defendant's constitutional rights. The prosecution is required to disclose to the defendant in discovery the witnesses it intends to call and the evidence it intends to introduce. Section 46-15-322, MCA. Moreover, the prosecutor is required to disclose evidence that tends to be exculpatory. *State v. Licht*, 266 Mont. 123, 129, 879 P.2d 670, 673-74 (1994). Finally, the prosecutor

17

is required to conform to the Montana Rules of Evidence and the defendant has the right to challenge proposed evidence throughout the trial process. No constitutional rights of the defendant are limited by the holding in this case.

¶47 We are not persuaded by the dissent's argument that the "inextricably intertwined" requirement should be further constrained by a requirement that the transaction rule be limited to the evidence that is essential to secure a conviction. There are clear difficulties determining at trial and on appeal the line to be drawn between the evidence without which the conviction could not occur and all other evidence offered by the prosecution. Adoption of an "evidence required to convict" standard risks requiring all evidence in a criminal case apart from the narrow ultimate issues—such as who pulled the trigger—to require pretrial notice and cautionary instructions as the evidence is presented. Clearly such an obligation would present difficult and often unclear choices to the trial judge, increasing the risk of error and jury confusion, and more appeals.

¶48 Finally, the dissent misconstrues our ruling in *State v. Henson,* 2010 MT 136, __ Mont. __, __ P.3d __. Rather than creating a double standard for application of the transaction rule to the prosecution and defense, *Henson* adopts the identical limitation on use of the rule for both. *Lacey* imposed restrictions on the prosecution's use of evidence concerning conduct of or with witnesses not part of the crime being prosecuted. *Henson* applied that ruling to the use of such evidence by the defense.

¶49 We hold that evidence of Stout's campaign to portray Miller as a stalker was inextricably linked to proving that she murdered Bill and was properly admitted.

18

¶50 *Issue Three: Whether the District Court properly admitted opinion testimony from a police officer concerning blood evidence at the scene.* This Court reviews rulings on the admissibility of evidence to determine whether there has been an abuse of discretion. *Paoni*, ¶ 13.

¶51 Stout contends that the District Court erred in allowing Matt Cashell, one of the investigating detectives, to offer his opinion that Bill's body was moved after he was shot, based in part upon the blood stains found on and around the body. Cashell was an officer with the Ravalli County Sheriff's Department and Deputy Ravalli County Coroner. He participated in the initial crime scene investigation and testified on several separate occasions at trial.

¶52 When Cashell first appeared on June 2 early in the trial, he testified that he had a four-year degree in justice studies, was a graduate of the Montana Law Enforcement Academy, and was Deputy Ravalli County Coroner. He generally described what he saw at the scene and identified the photographs he took. On cross-examination, the defense asked him a series of questions about the location and appearance of blood spots and stains on and around the body. He was also cross-examined about his examination of the body for rigor mortis and whether he came to any conclusions as a result. There was no objection during any of this testimony. He testified on subsequent occasions that are not at issue in this appeal.

¶53 On June 5 Cashell was called to testify again. He testified about specialized training he received in blood stain pattern analysis, including impact stains, transfer stains and drying times. He described that the course included lab work using human blood to

evaluate the effects of blood stains and drying times. He then testified that at the scene of Bill's death he found a large volume of blood that had substantially coagulated, explaining the difference between dried and coagulated blood. Cashell testified that in his opinion based on the coagulation and drying he saw, Bill had been dead "for some time" when he examined the body. He also described in some detail the meanings of rigor mortis and lividity, and his observations of Bill's body that led him to conclude that Bill had been dead 8 to 12 hours or longer at the time of his observations. There was no relevant objection during any part of this testimony.

¶54     Cashell testified again on June 6. He testified that based on his observations he concluded that the body, the covers and the pillow had been moved after death. He testified that the blood stains indicated to him that the body had been moved after death. At this point the defense asked to voir dire the witness and asked him about his blood stain analysis workshop. He testified that he completed a week-long course at the State Crime Lab, taught by officials from the Kansas City Police Department and the Kansas Bureau of Investigation. Cashell indicated that he had not testified on blood stain analysis before and had authored no articles in the area. The defense then objected that Cashell was not qualified to give expert testimony because his workshop was only a week long. The District Court ruled that Cashell could state his opinion, and that the "jury can give it such weight as they feel it deserves."

¶55     He testified that with the body as they found it, the bullet could not have traveled through Bill's head to the position in the pillow where it was located. Therefore, he concluded that the body must have been moved after Bill was shot. He testified that as

20

the body was found, there was blood that was "actually above or against gravity from the wound" again indicating that the body had been moved. He testified that there was a defined margin or line in the blood stain on the left hand as if it had been partially in a pool of blood, but that the hand was not in a pool of blood when the body was found. The same was true in other areas of the body. He testified that there were coagulated deposits on top of blood stains, indicating that the blood had coagulated before it was deposited on the stain, again indicating body movement.

¶56    Cashell described other blood stains that were deposited when the blood was already coagulated because the blood had not run. He described the position the body would have to be in at the time of death to create the blood patterns he found. He then testified about lividity and the purple discoloration in the body, and his conclusion that the lividity had become fixed with the body in the position in which it was found. Cashell concluded that Bill had been lying on his right side when he was shot, that the body had stayed in that position long enough for blood to begin to coagulate, and that it had then been rolled over onto the back in the position in which it was found.

¶57    Cashell also testified that there was a pillow over Bill's head when the body was found, covering the entrance wound in the head, indicating that the pillow had been moved. He testified that there were drops of blood found under the sheet, indicating that the sheet had been moved. He testified that fingerprints in the blood were left by someone other than Bill, based upon the position of the bedding and his conclusion that Bill could not have moved his hand to make the prints after he was dead.

¶58 On cross-examination, defense counsel stated that "it's obvious, without going through any blood stain analysis, that things were moved in the room because, as you first started to testify, the one green pillow was over the entrance wound . . . ." Defense counsel further stated that "when we look at the photos, it's obvious someone put the bed covers over his right arm, too. . . ." During closing argument, defense counsel mentioned Cashell's testimony only once, observing: "I don't care who moved the body. We know somebody did something because the pillows are there."

¶59 A district court may allow expert testimony if the witness has the requisite knowledge, skill, experience, training or education to testify. Rule 702, M. R. Evid.; *State v. Russette*, 2002 MT 200, ¶ 14, 311 Mont. 188, 53 P.3d 1256.[1] The witness must have specialized knowledge that would distinguish him from a lay person. *State v. Maier*, 1999 MT 51, ¶ 89, 293 Mont. 403, 977 P.2d 298. The district court has great latitude in ruling on the admissibility of expert testimony, and the ruling will not be disturbed without a showing of abuse of discretion. *State v. Crawford*, 2003 MT 118, ¶ 30, 315 Mont. 480, 68 P.3d 484.

¶60 Stout contends that Cashell should not have been allowed to state his opinion that the body had been moved because that was "key circumstantial evidence that Bill's death was not a suicide because someone had moved his body after death." However, at the trial itself, it was clear that the defense did not contest the fact that the body and bedding had been tampered with after Bill was shot. Indeed, they could not have taken any other

---

[1] *Russette* states that an expert must be qualified by "knowledge, skill, experience, training and education." (Emphasis added.) This is an incorrect statement of the law of Rule 702, which lists the possible areas of qualification in the disjunctive.

position under the facts because a pillow was found over the entrance wound and blood was found under the sheet. Under these circumstances Stout cannot demonstrate any prejudice arising from Cashell's testimony that the body and bedding had been moved.

¶61 Further, the District Court had great latitude in assessing the qualifications of the witness as an expert. While Stout argues now that Cashell was not an expert because he lacked a college degree in blood spatter analysis, had not testified as an expert in other trials and had not published papers on the topic, those are not pre-requisites to qualification to provide expert testimony. Cashell had a four-year degree in law enforcement, was a Law Enforcement Academy graduate, had experience as a detective and coroner, and had completed a week-long course in blood spatter evidence. This training and experience adequately qualified him to give the testimony he gave, especially in light of the fact that much of his testimony was intuitive. Much of his testimony involved propositions such as blood flows down, a discrete line in a blood stain is significant, and a pillow over the entrance wound is significant. In addition, he testified extensively and without objection as to his observations and conclusions on rigor mortis and lividity.

¶62 Last, as noted earlier, the jury was instructed that they could give expert testimony the weight they thought it deserved, and could reject it entirely if the reasons given for it were unsound. And, of course, the defense was free to present expert testimony from other witnesses contesting the opinions offered by Cashell. The District Court did not abuse its discretion allowing Cashell to testify.

¶63    *Issue Four: Whether the District Court erred in refusing to suppress evidence seized from a motorcycle saddlebag under the authority of a search warrant.*

¶64    Stout appeals the District Court's denial of her motion to suppress the pistol that was used to kill Bill. This Court reviews denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and its interpretation of the law is correct. *State v. Marks*, 2002 MT 255, ¶ 10, 312 Mont. 169, 59 P.3d 369. Stout contends that the investigating officers exceeded the scope of the search warrant by seizing the gun from the saddle bag of the motorcycle in the garage. This Court reviews a district court's denial of a motion to suppress evidence to determine whether the findings of fact are clearly erroneous and the interpretation and application of the law are correct. *State v. Marks*, 2002 MT 255, ¶ 10, 312 Mont. 169, 59 P.3d 369.

¶65    When officers arrived at the Stout residence and determined that Bill had been shot, they sought and obtained a search warrant. The warrant authorized the officers to search for "any firearm that could be related to the death of William Lee Stout." The warrant described the places to be searched as

> in and upon the premises residence, outbuildings and vehicles of William Lee Stout and Anne Marie Stout, located at 266 Trapper Meadow Road, Darby, MT 59840 and described as a single story single family dwelling of frame construction with natural wood colored siding and having brown asphalt shingle roofing with a partial basement and an attached garage. The residence has a "Gone Fishing" sign on the east side of the door. The vehicles of William Stout and Anne Marie Stout are one red 2000 Ford truck . . . , one 1995 green Chevrolet Suburban . . . , one 2000 White Trails West Horse Trailer . . . , and one black Honda passenger car . . . .

The warrant concluded that the Justice of the Peace was "satisfied that there is probable cause to believe that the property described [i.e., the gun and other items that were the

24

object of the search] is in the said premises residence, outbuilding, and vehicles of William Stout and Anne Marie Stout described above."

¶66 Stout contends that the officers could not search the saddlebags of the motorcycle found inside the garage because the motorcycle was not specifically listed in the search warrant as a one of the Stout vehicles. Stout does not contend that there was not probable cause to issue the search warrant or that the items to be seized were not properly described. Her contention is that the officers exceeded the scope of the warrant by looking into the motorcycle saddlebag. The District Court denied Stout's motion to suppress, holding that the premises to be searched were described with particularity as including the attached garage, and that "a search of the garage and whatever containers and receptacles were located in the garage that might hold a firearm related to the death of Bill Stout was permissible." The District Court also concluded that the warrant authorization to search the "vehicles of William Lee Stout and Anne Marie Stout" was "sufficiently particular to include the motorcycle at issue."

¶67 Stout cites and quotes only marginally relevant cases dealing with warrantless searches, but her primary contention is that since the warrant lists several specific vehicles, the general authorization in the warrant to search "vehicles" must be read to apply only to the ones specifically listed. She contends that the "warrant's plain language excluded [the motorcycle] from the authorized search."

¶68 We cannot adopt Stout's cribbed reading of the warrant. The warrant authorized a search of the premises, specifically including the garage and vehicles. Under established law that alone would be sufficient to permit the search of any vehicles found on the

25

premises. *U.S. v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985); *U.S. v. Duque*, 62 F.3d 1146, 1151 (9th Cir. 1995); *U.S. v. Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006). The fact that the warrant went on and described four particular vehicles does not alter the conclusion that the motorcycle bags were subject to search. While Stout argues that the warrant should be construed to allow a search of the listed vehicles and only the listed vehicles, the warrant does not say that. We see no reason to add language to an otherwise valid and particular warrant.

¶69 The District Court properly denied the motion to suppress and properly admitted the evidence of the pistol at trial.

¶70 *Issue Five: Whether the District Court had jurisdiction to order that the sentence be modified after conclusion of the appeal to include costs of appellate counsel.*

¶71 Following Stout's conviction, the District Court entered an Amended Judgment and Commitment sentencing her to life in prison. The District Court also ordered her to pay the costs of her public defender in the amount of $57,127. That amount of reimbursement was stipulated between the prosecution and Stout, and she does not contest this order. Five days later the District Court entered a second order re-stating the stipulated amount and further ordering that the amount "shall be increased, if her conviction is affirmed, on appeal, by assessing all hours incurred by the Montana Office of Public Defender attorneys from January 1, 2009, until completion of the appeal." Stout contends on appeal that the District Court lacked power to order the sentence to be so modified in the future. We agree.

¶72 This Court reviews sentence conditions for legality. *State v. Stiles*, 2008 MT 390, ¶ 13, 347 Mont. 95, 197 P.3d 966. Section 46-8-113, MCA, allows a court to impose repayment of the costs of assigned counsel as a condition of a sentence, limited to "costs incurred by the office of state public defender . . . for providing the defendant with counsel in the criminal proceeding." The District Court was within its power under this statute ordering Stout to reimburse the defense costs of $57,127 incurred through the trial. However, the subsequent order that the amount could be increased if there were an appeal and if the conviction were affirmed failed to specify the amount of reimbursement required. It also failed to specify how disputes over the reimbursement amount would be resolved and how the amount of reimbursement would be memorialized in a sentencing document.[2]

¶73 Therefore, it is clear that at some point in the future the District Court would have to modify the sentence as to reimbursement of defense costs. However, "no statutory authority exists for the District Court to reserve authority for itself to modify the sentence regarding reimbursement of court-appointed counsel once it has been imposed. The District Court lacks the authority to revisit the matter at a latter hearing." *State v. Hirt*, 2005 MT 285, ¶ 20, 329 Mont. 267, 124 P.3d 147. It is evident that the portion of the order requiring reimbursement of appeal costs would require the District Court to revisit the matter in the future. Therefore any portion of the sentence below that requires Stout

---

[2] Disputes could clearly arise as to the number of hours expended upon appeal, the hourly rate and other matters. Prior to finally settling the amount, the parties disputed the trial counsel reimbursement amount, prompting a petition for supervisory control to this Court.

27

to pay reimbursement for "all hours incurred by the Montana Officer of Public Defender attorneys from January 1, 2009, until completion of the appeal" is hereby vacated. However, the District Court could, upon a proper record and by specifying the amount, order restitution for future costs. *See e.g. State v. Benoit*, 2002 MT 166, 310 Mont. 449, 51 P.3d 495. We remand to the District Court for the sole purpose of entering a new order concerning reimbursement of defense costs on appeal consistent with this opinion.

¶74 Stout's conviction is affirmed. The portion of her sentence dealing with reimbursement of attorney costs on appeal is vacated and remanded to the District Court for entry of a new order consistent with this opinion.

/S/ MIKE McGRATH

/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE

Justice James C. Nelson, dissenting.

## I. Introduction

¶75 I disagree with the Court's broad application of the transaction rule (§ 26-1-103, MCA) in this case and therefore dissent from the Court's decision as to Issue Two. But rather than simply concede that the transaction rule has finally swallowed Rule 404(b) of the Montana Rules of Evidence, I have elected to critically evaluate this Court's

interpretation of Rule 404(b) to determine if our jurisprudence is consistent with the rule's language and its historical underpinnings. Based on my research, I have concluded that *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979), *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991), and their progeny have strayed far afield from the narrow purpose of Rule 404(b). Moreover, this Court's approach to Rule 404(b) has unnecessarily cabined the admission of a broad range of evidence that Rule 404(b) actually allows—including, as here, evidence of plan, preparation, and identity. My research has led me to conclude that the most necessary and salutary requirements of *Just* and *Matt* are the procedural ones—notice to the defense and cautionary instructions when evidence of other crimes, wrongs, or acts is or has been offered. These requirements ensure that the defendant is not blindsided at trial and that the jury is clearly instructed that the evidence is being admitted, not to prove that the defendant acted in conformity with her character, but rather to prove some other material issue in the case. If the Attorney General and the courts adopt the approach suggested below, I believe that prosecutors will be more inclined to use Rule 404(b). And I am hopeful that this Court will be more inclined to enforce Rule 404(b), in lieu of permitting expansion of the transaction rule.

¶76 Accordingly, my arguments herein are twofold. First, I disagree with the Court's conclusion that the evidence of Stout's so-called harassment campaign was admissible under the transaction rule. This is not to say that the evidence was not admissible under any legal theory at all. To the contrary, I believe this evidence could have been admitted under Rule 404(b), not § 26-1-103, MCA. This is a critical distinction. Evidence admitted under Rule 404(b) is subject to certain substantive and procedural safeguards,

29

*see Matt*, 249 Mont. at 142-43, 814 P.2d at 56, which the prosecution flagrantly disregarded in this case. In contrast, evidence admitted under § 26-1-103, MCA, is not subject to these same safeguards. In fact, this statute has been used by prosecutors with increasing frequency as a virtual free pass to introduce evidence of uncharged misconduct without having to contend with the inconveniences of notice, a reasoned legal argument explaining the purpose for which the evidence is being offered, and cautionary instructions—all of which are required by *Matt*. A prosecutor need only recite the talismanic phrase, "It's all part of the criminal transaction," and the perceived Red Sea of obstacles to the admission of the uncharged misconduct evidence miraculously parts.

¶77 Yet, recognizing the dangers posed by such unrestrained use of the transaction rule, we have cautioned that "[t]he transaction rule must not be expanded to the point that the prohibition of character evidence under M. R. Evid. 404(b) is swallowed," *State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776, and we have accordingly limited the admission of evidence under § 26-1-103, MCA, to evidence that is "inextricably linked" to a fact in dispute, *State v. Guill*, 2010 MT 69, ¶¶ 25-30, 355 Mont. 490, 228 P.3d 1152. My disagreement with the Court's approach in this case, therefore, is its distortion of the "inextricably linked" standard. In my view, it is absurd and totally disingenuous to maintain, as the Court does, that the evidence of Stout's harassment campaign met this standard simply because it was "evidence of the crime." Opinion, ¶ 45. All probative evidence offered by the prosecution is "evidence of the crime." Thus, it appears that we are simply pretending to require an "inextricable" connection

30

between the proffered transaction evidence and "a fact in dispute" and that we have no intention of consistently enforcing actual compliance with this standard's true meaning.

¶78 Second, as alluded to above, this case highlights an even bigger problem with our jurisprudence under Rule 404(b) and the transaction rule—namely, that we have utterly confounded the distinctions between Rule 404(b) and § 26-1-103, MCA. Indeed, today's decision effects the most substantial encroachment ever by § 26-1-103, MCA, on the evidentiary realm of Rule 404(b). In holding that the evidence of Stout's harassment campaign—which is classic Rule 404(b) evidence—is admissible under the transaction rule, the Court treats these two rules as coextensive, applying to the very same categories of evidence. Of course, given the choice, the proponent of the uncharged misconduct evidence will always choose the transaction rule—the path of least resistance—over Rule 404(b). Thus, the Court has effectively consigned Rule 404(b) to obscurity and dealt a fatal blow to the safeguards of *Matt*. Henceforth, a prosecutor seeking to present evidence of other crimes, wrongs, or acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident (the purposes expressly recognized in Rule 404(b)) may simply bypass Rule 404(b) altogether and, citing today's decision, get the evidence admitted under § 26-1-103, MCA. This approach is intolerable, not only because it promotes sloppy practice by prosecutors, but also because it encourages juries to convict on the improper basis of the accused's bad character and supposed propensity for unlawful conduct.

¶79 Yet, as noted, a critical analysis of our jurisprudence under *Just* and *Matt* reveals that the Modified *Just* Rule is partly to blame for this untenable situation. As I explain

31

below, this rule creates certain barriers to the legitimate use of uncharged misconduct evidence and, thus, actually encourages prosecutors and courts to resort to alternative schemes—such as the transaction rule—in order to get the evidence admitted, even though Rule 404(b) clearly governs. Therefore, since it is not only preferable but mandatory that safeguards be followed when evidence of uncharged misconduct is admitted, I would revise the Modified *Just* Rule so that it conforms to the actual purpose and scope of Rule 404(b). This presumably would make Rule 404(b) more accessible to proponents of uncharged misconduct evidence and would eliminate the intellectually dishonest approach of admitting such evidence under § 26-1-103, MCA—a statute that was effectively supplanted, in any event, when the Rules of Evidence were adopted.

¶80 I address these points below, first discussing Rule 404(b) and the Modified *Just* Rule, and then discussing the Court's approach today under § 26-1-103, MCA.

## II. Rule 404(b)

¶81 Again, my primary disagreement with the Court's decision is our increasing propensity to allow more and more evidence to be admitted under the transaction rule at the expense of Rule 404(b) and its safeguards. I completely agree with the Court's statement that "[a]pplication of the transaction rule should not be used to avoid Rule 404 and the notice and instruction requirements it specifies." Opinion, ¶ 39. I also agree with the statement that "the prosecutor is required to conform to the Montana Rules of Evidence."[1] Opinion, ¶ 46. To this end, I believe that any evidence which falls within

---

[1] In this regard, I note that the Attorney General, who has statutory authority to supervise and direct county attorneys in all matters pertaining to the duties of their office,

the scope of Rule 404(b) *must* be admitted pursuant to the requirements of the Modified *Just* Rule (with two exceptions, noted below) and that the proponent of the evidence may not circumvent those requirements by way of the transaction rule. In other words, the transaction rule and Rule 404(b) do *not* overlap, but rather apply to mutually exclusive categories of evidence—something we have already suggested in prior cases. *See e.g. State v. Lozon*, 2004 MT 34, ¶ 12, 320 Mont. 26, 85 P.3d 753 (noting that there is a "distinction" between Rule 404(b) evidence and transaction rule evidence). Thus, my argument is not that we must draw a line between "the evidence without which the conviction could not occur and all other evidence offered by the prosecution." Opinion, ¶ 47. Rather, the line to be drawn is between Rule 404(b) evidence and transaction rule evidence. We must make that line clear, and we must consistently enforce compliance with it.

¶82 In this regard, I noted in my *Guill* concurrence that § 26-1-103, MCA, is actually a mid-1800s statute that applied in *civil* litigation, not *criminal* prosecutions. It originated in David Dudley Field's *The Code of Civil Procedure of the State of New-York*, Part IV (published in 1850). *See Guill*, ¶ 50 (Nelson, J., concurring). In the 1990s, this Court attributed the doctrines of res gestae and corpus delicti (from which the "inextricably linked" standard originates) to § 26-1-103, MCA, and began applying this statute in *criminal* cases. *See State v. Derbyshire*, 2009 MT 27, ¶¶ 31-33, 349 Mont. 114, 201 P.3d

plays an important role in enforcing such compliance with the Rules of Evidence. *See* § 2-15-501(5), MCA; *see also e.g. State ex rel. Fletcher v. Dist. Court*, 260 Mont. 410, 416, 859 P.2d 992, 995-96 (1993) (Under § 2-15-501, MCA, "the Attorney General was well within his authority to review the cases against the Petitioners and to direct the Lincoln County Attorney not to use the Tilton evidence.").

811. In so doing, however, we completely overlooked the fact that Rule 404(b), as the later provision (it was adopted in 1976), prevails over § 26-1-103, MCA, to the extent of any inconsistency or overlap. *Cf. Oster v. Valley County*, 2006 MT 180, ¶ 17, 333 Mont. 76, 140 P.3d 1079 (statutes relating to the same subject must be harmonized as much as possible, giving effect to each); *Ross v. City of Great Falls*, 1998 MT 276, ¶ 19, 291 Mont. 377, 967 P.2d 1103 (where the terms and necessary operation of a later statute cannot be harmonized with the terms and effect of an earlier statute, the earlier statute is impliedly repealed). Indeed, the Montana Rules of Evidence supplanted all common law doctrines and statutory provisions governing evidentiary matters to which the Rules of Evidence applied. This Court adopted the Rules of Evidence pursuant to the authority granted by Article VII, Section 2 of the Montana Constitution. *See* Chapter Compiler's Comments to Title 26, chapter 10, MCA, at 163 (2008 Annotations). And, acting under that same authority, this Court declared various statutory sections to have been superseded by the Rules of Evidence. *See id.* We noted that upon the adoption of the Rules of Evidence, these statutory sections were "rendered obsolete, unnecessary and redundant," and we explained that "the continued presence of said sections as a part of the law of Montana tends to lead to confusion, uncertainty and conflict in the law, all of which are contrary to the spirit and purpose of the Montana Rules of Evidence and the ends of justice." *See id.* Given the "confusion, uncertainty and conflict in the law" created by § 26-1-103, MCA, it is unfortunate that we did not include this provision in the list of superseded statutes. But the clear implication of not declaring this statute to have been superseded by the Rules of Evidence is that the statute must apply to a

34

category of evidence to which the Rules of Evidence do *not* apply. In other words, as suggested at the outset, Rule 404(b) and § 26-1-103, MCA, may be harmonized by interpreting them as applying to mutually exclusive categories of evidence.

¶83 What the Court fails to recognize or accept in the present case is that the evidence in question (Stout's harassment campaign) is Rule 404(b) evidence and, therefore, cannot be admitted pursuant to § 26-1-103, MCA. Rule 404(b) controls. The problem, and the reason for much of the confusion in our Rule 404(b)/transaction rule jurisprudence, is that the Court has lost sight of Rule 404(b)'s scope and purpose. Thus, it is necessary to review the function of this rule and the evidence to which it applies.

## A. Purpose

¶84 The fundamental purpose of Rule 404 is to prohibit a party from introducing evidence of a person's character to show that the person acted in conformity therewith. Specifically, Rule 404(a) states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Likewise, Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evidence of character, disposition, or propensity is prohibited not because it is irrelevant, but because "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 218 (1948). Experience has taught that the introduction of character evidence creates an unacceptable risk that the trier of fact will be tempted, at

35

least on a subconscious level, to penalize the defendant for his or her past misdeeds. *See* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 1:03, 9 (rev. ed., West 1998); *Old Chief v. United States*, 519 U.S. 172, 180-81, 117 S. Ct. 644, 650-51 (1997) (the risk of propensity evidence is that the jury will convict for crimes other than those charged or that, uncertain of guilt, the jury will convict anyway because a bad person deserves punishment); Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:28, 746 (3d ed., Thomson/West 2007) ("The risk [is] that a jury will draw a deadly and decidedly improper three-step inference, from bad act to bad person to guilty person, or give way to the emotional impulse to punish because the other act alone shows that punishment is deserved."). This conflicts with the basic tenet of our system of justice that a defendant may be convicted and punished only for the criminal act charged, not for his or her character or for other, uncharged acts. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 1:03, 9, § 2:19, 104-05.[2]

---

[2] *See also* Mueller & Kirkpatrick, *Federal Evidence* § 4:22, 697-98 ("It is a fundamental principle of American jurisprudence, and seemingly an axiom of simple fairness, that a person accused of crime should be tried for some specific act—for what he has done, and not for what he is."); *State v. Tiedemann*, 139 Mont. 237, 242, 362 P.2d 529, 531 (1961) (when a defendant is put upon trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone; proof that he committed other crimes is not admissible to show his depravity or criminal propensities, or the resultant likelihood of his committing the offense charged); *State v. Derbyshire*, 2009 MT 27, ¶ 22, 349 Mont. 114, 201 P.3d 811 (a defendant must not be convicted merely because he is an unsavory person or on the rationale that because he committed a crime in the past, he has a defect of character that makes him more likely than people generally to have committed the charged offense); *State v. Aakre*, 2002 MT 101, ¶ 34, 309 Mont. 403, 46 P.3d 648 (the purposes of Rule 404(b) include "protecting the presumption of innocence" and "preventing the admission of uncharged conduct as circumstantial proof of charged conduct except where the uncharged conduct possesses 'independent' or 'special' probative value relevant to a non-character theory"); *United*

¶85 At the same time, however, Rule 404(a) acknowledges certain exceptions to the general rule barring character evidence. For example, Rule 404(a)(1) states that evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same, may be admissible. (Rule 405, in turn, governs the methods of proving character.) Similarly, while Rule 404(b) bars evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith," the rule states that such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The term "such as" indicates that this list is illustrative, not exhaustive. *See Matt*, 249 Mont. at 141-42, 814 P.2d at 55-56; Commission Comments to Title 26, chapter 10, Rule 404, MCA, at 278-79 (2008 Annotations); Imwinkelried, *Uncharged Misconduct Evidence* § 3:01, 2 (it is "virtually impossible to completely catalogue all the permissible theories of independent relevance" for which other-acts evidence may be offered under Rule 404(b)); Mueller & Kirkpatrick, *Federal Evidence* § 4:28, 744 (the list in Rule 404(b) is "nonexclusive"); *McCormick on Evidence* vol. 1, § 190, 753 (Kenneth S. Broun, 6th ed., Thomson/West 2006) (there are numerous uses to which

---

*States v. Cortijo-Diaz*, 875 F.2d 13, 15 (1st Cir. 1989) (the prohibition against other-acts evidence is based on "long-established notions of fair play and due process," which forbid finding present guilt based on a "bad character profile"); *United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980) ("It is fundamental to American jurisprudence that a defendant must be tried for what he did, not for who he is. That precept is . . . a concomitant of the presumption of innocence." (citation, alteration, and internal quotation marks omitted)); Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* vol. 22, § 5239, 437-38 (West 1978) (the use of other-acts evidence may undermine the prohibition on double jeopardy, the right to proof of guilt beyond a reasonable doubt, and the privilege against self-incrimination).

evidence of other crimes, wrongs, or acts may be put, and those enumerated in the rule "are neither mutually exclusive nor collectively exhaustive"). And the critical point of Rule 404(b), therefore, is that evidence of other crimes, wrongs, or acts may be admissible for various purposes *except* to show action in conformity with character. In other words, "Rule 404(b) bars not evidence as such, but a theory of admissibility." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998). Indeed, Rule 404(b) is "simply a special application of the doctrine of multiple admissibility," under which "evidence that is inadmissible for one purpose is not to be excluded if it is admissible for some other purpose unless the judge, in his discretion, determines that the danger of its prejudicial use for the improper purpose outweighs its legitimate probative value." Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* vol. 22, § 5239, 435-36 (West 1978). Rule 404(b) admits evidence of other acts "whenever it is relevant without using the inference of character anywhere in the chain of inference," i.e., if the evidence "proves a material issue without requiring any inference to the defendant's criminal disposition." *Id.*, 2010 Supp., § 5239, 540; *see also* David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 4.4, 231-32 (Aspen Publishers 2009) (explaining that other-acts evidence may be admitted under a theory that avoids any character-based propensity inference).

### B. Scope

¶86 Turning to the question of scope, Rule 404(b) provides, in full, as follows:

> Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In determining the category of evidence to which this rule applies, the following three facets of its language and underlying policies are instructive.

¶87   First, Rule 404(b) refers to "other" crimes, wrongs, or acts, which "[i]n this context . . . means acts 'other than' the act(s) specified in the pleading:  crimes other than those alleged in the indictment and torts other than those averred in the complaint." Imwinkelried, *Uncharged Misconduct Evidence* § 2:11, 57; *accord* Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 445; *see also People v. Gordon*, 212 Cal. Rptr. 174, 188 (Cal. App. 3d Dist. 1985) (an act is uncharged if it falls outside the accusatory pleading, which can happen when the act testified to either involves a different actus reus or occurred at a time different than the charged offense), *disapproved on other grounds, People v. Frazer*, 982 P.2d 180, 198 (Cal. 1999).  It makes no difference whether the uncharged act took place before or after the charged act—although for some evidentiary purposes, a subsequent act would be irrelevant while a prior act would not (e.g., to show knowledge at a particular point in time).  *See* Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 445.

¶88   Second, Rule 404(b) refers to "crimes, wrongs, or acts."  These three terms "are obviously not coextensive.  The last term is the broadest and includes the prior two concepts."  Imwinkelried, *Uncharged Misconduct Evidence* § 2:02, 4.  Hence, "it would have been more precise if the drafters of Rule 404(b) had used the language, 'other acts, including crimes and civil wrongs.' "  *Id.*  In this regard, it is important to keep in mind

that "the act need not be either a crime or a civil wrong such as a tort or breach of contract." *Id.*; *see also* Mueller & Kirkpatrick, *Federal Evidence* § 4:28, 747 ("[W]e are talking about *acts*, so it does not matter whether they were criminal or not, and certainly it does not matter whether they led to charges or convictions."); Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 2, § 404.20[2][a], 404-42 (Joseph M. McLaughlin ed., 2d ed., Matthew Bender & Co. 2010) ("Rule 404(b)'s terminology 'other crimes, wrongs, or acts' includes conduct that is neither criminal nor unlawful if it is relevant to a consequential fact."). Indeed, Rule 404(b) applies to any conduct, criminal or noncriminal, that "effectively impugns" or "reflects negatively" on the defendant's character. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 2:15, 81; Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 4.6, 270; *see also Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 1499 (1988) (Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character"); Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 456-57 ("other acts" includes "any conduct, good or bad, that tend[s] to show the character of the person involved"). This is so because the policies underlying Rule 404(b)'s general prohibition come into play "whenever, as a practical matter, the evidence amounts to an attack on the defendant's character," which in turn "might tempt the jury to decide the case against the defendant on an improper basis." Imwinkelried, *Uncharged Misconduct Evidence* § 2:15, 81.

¶89 Third, although it may seem self-evident, it is important to stress that the purpose of offering evidence of other crimes, wrongs, or acts under Rule 404(b) is (from the

prosecutor's perspective) to establish the defendant's guilt of the charged act. *See id.*, § 6:18, 46-47 ("[T]he prosecutor ordinarily offers uncharged misconduct as evidence on the historical merits of the case," i.e., "to prove essential elements of the charged crime" or "to rebut affirmative defenses on the merits."). In this regard, Professor Imwinkelried explains that a crime, under the conventional definition, consists of an actus reus, a mens rea, and proof of the defendant's identity as the person who committed the actus reus and possessed the mens rea. *Id.*, § 3:01, 3. Other-acts evidence, in turn, may be used to establish each of these elements. *See generally id.*, chs. 3, 4, and 5; *accord* Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 460 (evidence may be offered under Rule 404(b) to prove "that the allegedly criminal act took place," "that the accused was the actor," and "that the accused had the requisite mental state").

¶90 With respect to identity, for example, other-acts evidence may be used to show that the defendant attempted to cast suspicion on a third party, which indicates consciousness of guilt, which in turn is evidence that the defendant is the person who committed the crime. Imwinkelried, *Uncharged Misconduct Evidence* § 3:04, 10-11. Likewise, proof that the defendant entertained a plan that included the commission of the charged crime is logically relevant to show the defendant's identity as the criminal, *id.*, § 3:21, 112, as well as the doing of the criminal act and the defendant's intent, *see McCormick on Evidence* § 190, 755. Thus, the prosecutor may prove any uncharged act by the defendant which shows that the defendant in fact and in mind formed a plan that included the charged and uncharged acts as stages in the plan's execution. Imwinkelried,

*Uncharged Misconduct Evidence*, § 3:22, 115.[3]  For instance, the defendant's theft of a

car can be used to show the defendant's plan to use the car as a getaway vehicle in a

kidnapping or a robbery.  *Id.* at 115-16.  Or, in the present case, the uncharged acts that

made up Stout's harassment campaign (spurious emails and letters, hang-up phone calls,

and acts of petty vandalism) show Stout's plan to kill her husband—apparently for

financial gain, or for retribution for Bill's affair with Barbara Miller, or for both—and

"drag a red herring across the trail of the investigation" (Opinion, ¶ 44).  They are also

evidence of "preparatory acts" Stout took to commit the homicide and cast suspicion on a

third party (Miller), which is logically relevant to the issue of Stout's identity as the

perpetrator of the crime, *see* Imwinkelried, *Uncharged Misconduct Evidence*, § 3:25, 137,

and to the issue of whether she shot Bill purposely or knowingly, *see id.*, § 5:37, 112 ("If

the defendant has prepared to commit the charged crime, the preparation raises the

---

[3] *See also McCormick on Evidence* § 190, 755 (each act "should be an integral part of an overarching plan explicitly conceived and executed by the defendant or his confederates"); Wright & Graham, *Federal Practice & Procedure: Evidence* § 5244, 500 (under this theory, the defendant's conduct "is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part," and the uncharged act "is admitted to show this larger goal rather than to show defendant's propensity to commit crimes"); Mueller & Kirkpatrick, *Federal Evidence* § 4:34, 842 (the use of other crimes or acts to prove plan "does not involve the forbidden general propensity inference because the argument is not that the defendant is predisposed toward committing the charged offense, but that the defendant actually formed the plan or scheme involved in committing the charged crime"); *State v. Aakre*, 2002 MT 101, ¶ 46, 309 Mont. 403, 46 P.3d 648 (defining "plan" under Rule 404(b) as "a method for achieving an end").

probability that the defendant committed the act with mens rea."). These are legitimate "other purpose" uses of other-acts evidence under Rule 404(b).[4]

¶91 The Court contends that evidence which serves to "complete the picture" or "provide essential context" of the offense is admissible under the transaction rule. Opinion, ¶¶ 38, 45. It is noteworthy, therefore, that among the various permissible purposes for admitting other-acts evidence *under Rule 404(b)* (such as plan, motive, and opportunity), Professor McCormick lists first: "To complete the story of the crime on

---

[4] It should be noted here that there is a category of cases in which courts have incorrectly allowed the introduction of uncharged misconduct under the rubric of "plan." If the proponent can show a series of similar acts, these courts admit the evidence on the theory that a pattern or systematic course of conduct is sufficient to establish a plan—basically, a plan-to-commit-a-series-of-similar-crimes theory. Imwinkelried, *Uncharged Misconduct Evidence* § 3:23, 126. Professor Imwinkelried concludes that in reality, these courts are illicitly allowing the proponent to prove the defendant's character, disposition, or propensity in violation of Rule 404(b)'s first sentence. *See id.* Other commentators are similarly critical of this misuse of the "plan" theory, *see* Wright & Graham, *Federal Practice & Procedure: Evidence* § 5244, 499-500; Mueller & Kirkpatrick, *Federal Evidence* § 4:35, 842-45; Weinstein & Berger, *Weinstein's Federal Evidence* § 404.22[5][a], 404-128, and this Court has likewise been critical of it on at least one occasion, *see Aakre*, ¶ 35 (rejecting the dissent's view that "evidence of a defendant's extremely similar abuse of another child" is evidence of "plan," and observing that " 'by irresponsibly invoking the theory without careful analysis, many courts have converted plan into a "euphemism" for bad character, and have allowed the theory to degenerate into "a dumping ground" for inadmissible bad character evidence' " (quoting Miguel A. Méndez & Edward J. Imwinkelried, People v. Ewoldt*: The California Supreme Court's About-Face on the Plan Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 28 Loy. L.A. L. Rev. 473, 478-79 (1995) (footnotes omitted))). Professors Wright and Graham observe that some opinions—and they notably include *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979), in this category—"seem unable or unwilling to see the difference between a plan and a predisposition." Wright & Graham, *Federal Practice & Procedure: Evidence*, 2010 Supp., § 5244, 680 n. 6. To drive the point home, they aptly point out: "Evidence that a judge has always affirmed the admission of evidence of other crimes may show his predispositions, but except for people who are into conspiracy theories it would hardly be considered proof of a plan. If the judge bought a rubber stamp reading 'There was no error in admitting the evidence under Rule 404(b),' the inference of a plan would be more plausible." *Id.*

trial by placing it in the context of nearby and nearly contemporaneous happenings," which he notes is often referred to as "same transaction" or "res gestae" evidence. *McCormick on Evidence* § 190, 754. McCormick states that this rationale for admission should be applied only when reference to the uncharged acts is "essential" to "a coherent and intelligible description of the offense at bar." *Id.* Thus, under this interpretation, evidence may be offered under Rule 404(b) for contextual purposes (so long as it does not involve drawing an impermissible propensity inference based on character).

¶92    In summary, Rule 404(b) covers a wide array of evidence but serves a very narrow purpose. It applies to all "other" crimes, wrongs, and acts, which are crimes, wrongs, and acts—whether criminal, noncriminal, wrongful, or nonwrongful—that have not been charged as an offense (i.e., are not charged in the information). But Rule 404(b) does not come into play unless the proffered evidence has a tendency to impugn the defendant's character. Recall that "Rule 404(b) bars not evidence as such, but a theory of admissibility." *Crowder*, 141 F.3d at 1206. The rule prohibits using evidence of other crimes, wrongs, or acts to show action in conformity with character on a particular occasion, but the rule provides that such evidence may be admissible for various other purposes, "such as" proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Restated, Rule 404(b) "generally provid[es] for the admission of all evidence of other acts that is relevant to an issue in trial, excepting only evidence offered to prove criminal propensity." Weinstein & Berger, *Weinstein's Federal Evidence* § 404.20[3], 404-46.11. Thus, the critical issue is whether the proffered other-acts evidence "proves a material issue without requiring any inference

to the defendant's criminal disposition."  Wright & Graham, *Federal Practice & Procedure: Evidence*, 2010 Supp., § 5239, 540.  If it does, then Rule 404(b) allows (i.e., does not exclude) the evidence, though the evidence must then be subjected to balancing under Rule 403.  *See* Weinstein & Berger, *Weinstein's Federal Evidence* § 404.21[1][a], 404-46.15 (to be admissible, the evidence "(1) must be relevant to an issue other than character or the defendant's propensity to commit the charged offense; and (2) must satisfy the balancing test imposed by Rule 403").  Conversely, "if the necessary logical steps [in the proponent's theory of admissibility] include an inference of general character or propensity, or if it seems likely that the proof will be *used* to support such an inference," then the principle of exclusion applies.  Mueller & Kirkpatrick, *Federal Evidence* § 4:28, 746-47.  What all this boils down to is that other-acts evidence is admissible if it is relevant (Rules 401 and 402), if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence (Rule 403), and so long as its use at trial does not involve an inference of propensity based on character (Rule 404(b)).

### C.  The Modified *Just* Rule

¶93   The State argues that the evidence of Stout's harassment campaign was admissible to show plan and preparation.  For the reasons discussed above, the State is correct.  The spurious emails and letters, the hang-up phone calls, and the petty vandalism are classic evidence of plan and preparation, which went to show Stout's identity as the perpetrator of Bill's death, as well as her intent to cause the death purposely or knowingly.  *See*

§ 45-5-102(1)(a), MCA (a person commits deliberate homicide if the person purposely or knowingly causes the death of another human being). Also for the reasons discussed above, this evidence falls squarely within the parameters of Rule 404(b). The spurious emails and letters, the hang-up phone calls, and the petty vandalism are all crimes, wrongs, or acts that were not charged as offenses in this case and, as such, are "other" crimes, wrongs, or acts. Moreover, they tend to impugn and reflect negatively on Stout's character, thus implicating Rule 404(b)'s proscription on using the evidence to prove that she acted in conformity with a bad character on the night in question. The prosecution thus was required to show that the evidence was being offered for some other permissible purpose; and, as just noted, other permissible purposes exist here, such as plan, preparation, and identity.

¶94 The problem is that the admission of other-acts evidence in Montana is presently governed by the Modified *Just* Rule, which would not have allowed the evidence of Stout's harassment campaign to be admitted. Indeed, there are problematic aspects of this rule which have created misconceptions regarding the scope of Rule 404(b), and I believe that we therefore should revise the Modified *Just* Rule in the manner suggested below.

¶95 This Court articulated the original *Just* Rule in *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979). The defendant (Just) was convicted of sexual intercourse without consent based in part on evidence of his prior, uncharged acts against the victim. All of those acts were sexual in nature, all of them involved the same victim, most of them involved exactly the type of sexual contact with which Just had been charged, and they

46

all occurred on a "regular" basis during the three-year period prior to the charged act. On appeal, Just challenged the introduction of this evidence, which prompted this Court to articulate "a four element test to determine the admissibility of evidence of other crimes or acts [in] criminal prosecutions such as the one here." *Id.* at 268-69, 602 P.2d at 961. The test contained four substantive requirements for admissibility:

> 1. The similarity of crimes or acts;
> 2. nearness in time; *and*
> 3. tendency to establish a common scheme, plan or system; *and*
> 4. the probative value of the evidence is not substantially outweighed by the prejudice to the defendant.

*Id.* at 268-69, 602 P.2d at 961. The Court also adopted three procedural requirements:

> (a) Evidence of other crimes may not be received unless there has been notice to the defendant that such evidence is to be introduced. The procedures set forth in section 46-18-503 MCA should serve as guidelines for the form and content of such notice. Additionally, the notice to the defendant shall include a statement as to the purposes for which such evidence is to be admitted.
> (b) At the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes.
> (c) In its final charge, the court should instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment.

*Id.* at 274, 602 P.2d at 963-64.

¶96     Of particular concern here are the first three substantive requirements of this test (similarity, nearness in time, and tendency to establish a common scheme, plan, or system). These criteria were derived from this Court's other-crimes-or-acts cases decided prior to the adoption of Rule 404(b). *See id.* at 267-68, 602 P.2d at 960. And while the

47

*Just* Court characterized Rule 404(b) as a recent codification of these criteria,[5] *see id.* at 268, 602 P.2d at 960, the fact is that the *Just* Rule was much narrower than Rule 404(b). Whereas Rule 404(b) provides that other-acts evidence may be admissible for various nonpropensity purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," the *Just* Rule allowed the introduction of such evidence for only one purpose: "to establish a common scheme, plan or system." It should also be noted that unlike the *Just* Rule, there is no express requirement in Rule 404(b) that the uncharged act must always be "similar" and "near in time" to the charged act.

¶97 Not surprisingly, 12 years after deciding *Just*, we observed that application of the *Just* Rule had "resulted in an apparent narrowing of the purposes listed in Rule 404(b)." *State v. Matt*, 249 Mont. 136, 141, 814 P.2d 52, 55 (1991). As an example of this, we cited *State v. Brown*, 242 Mont. 506, 791 P.2d 1384 (1990), where the Court held that the other-acts evidence at issue was inadmissible because the prosecution had failed to establish a common scheme, plan, or system. We noted in *Matt* that the *Brown* Court had failed to address the dissent's argument that the evidence was admissible to show the defendant's opportunity, motive, and intent. *See Matt*, 249 Mont. at 141-42, 814 P.2d at 56. In this regard, we acknowledged that other-acts evidence "may be admissible for many other purposes, including those specifically listed in Rule 404(b)." *Id.* at 142, 814 P.2d at 56. Consequently, while observing that "the four element rule of *Just* was proper

---

[5] The Montana Rules of Evidence were adopted December 29, 1976, and became effective July 1, 1977. *Just* was decided September 17, 1979.

under the facts of that case," *id.* at 141, 814 P.2d at 55, we modified the rule's third substantive criterion to "incorporate[ ] the various purposes described in Rule 404(b), and therefore eliminate[ ] the limitation that evidence is admissible only if it shows a common scheme, plan or system," *id.* at 142, 814 P.2d at 56. Hence, that criterion now states:

> (3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* at 142, 814 P.2d at 56. We similarly revised the fourth substantive criterion to conform to the language of Rule 403. *See id.*

¶98    Yet, while we modified *Just*'s third substantive criterion to make it consistent with the scope of Rule 404(b), the *Matt* Court wholly failed to consider whether requiring compliance with the first two substantive criteria for *all* other-acts evidence is consistent with the purpose of Rule 404(b). I conclude that it is not. Indeed, "the prevailing view in the United States is that even dissimilar acts can be logically relevant and admissible on an uncharged misconduct theory." Imwinkelried, *Uncharged Misconduct Evidence* § 2:13, 77. Notably, Professor Imwinkelried cites Montana as a jurisdiction that is out of sync with the rest of the country on this issue. *See id.* at n. 2 (citing *Matt*, 249 Mont. 136, 814 P.2d 52). He notes that there is an extensive body of caselaw admitting dissimilar acts for such purposes as proving the defendant's identity, intent, and motive. *Id.* at 77. He then goes on to explain:

> It is true that in some cases, dissimilar acts are properly excluded. For example, one of the permissible uses of uncharged misconduct evidence is to identify the defendant by showing that the defendant

49

committed an uncharged act with a modus operandi strikingly similar to that of the charged act. When offered for this purpose, the uncharged act must be similar in the extreme to the charged act. The uncharged act is logically irrelevant for that purpose unless there is a high degree of similarity between the two acts. But in such cases, the act is excluded because it is logically irrelevant and not merely because it is dissimilar.

The test should be logical relevance rather than similarity. The better view is that the judge should demand proof of similarity only if the proponent's theory of logical relevance assumes similarity. There are numerous situations in which dissimilar crimes are logically relevant. In some jurisdictions, the defendant's narcotics abuse is admissible to establish the motive for theft offenses such as robbery; the expensive drug habit supplies the financial need that motivates the theft. Other courts would unhesitatingly admit evidence of the defendant's theft of a car to be used in a subsequent kidnap attempt; the prior theft is logically relevant to show the defendant's overall plan. If a defendant on trial for murder attempts to suborn perjury, the attempted subornation is admissible to prove the defendant's consciousness of guilt of the charged crime. In none of these cases is the uncharged act "similar" to the charged act. However, in all these cases, the uncharged act is logically relevant and may qualify under the uncharged misconduct doctrine.

*Id.* at 77-78 (footnotes omitted); *accord* Mueller & Kirkpatrick, *Federal Evidence* § 4:35, 842 ("Other crimes or acts can suggest a plan to commit the charged crime even though they are different in nature from the charged offense. Stealing weapons or a car can indicate a plan to commit bank robbery, for example, since the weapons may be needed for the robbery and the car may be intended for use in making a getaway.").

¶99    This approach is clearly correct and consistent with the purpose of Rule 404(b), which is not to admit or exclude evidence of uncharged acts based on similarity, but rather is to preclude using evidence of other acts (whether similar or dissimilar) to establish a propensity inference based on character. Recall that Rule 404(b)'s first sentence has two components. Under the first component, uncharged acts may not be used "to prove the character of a person." Thus, the prosecutor may not prove that the

50

defendant is inclined to wrongdoing in general or that the defendant tends to commit a particular type of wrongdoing (such as rape or burglary). Imwinkelried, *Uncharged Misconduct Evidence* § 2:19, 103. But the prohibition on this type of proof is not total. According to the sentence's second component, proof of a person's character is barred only when, in turn, character is used "in order to show action in conformity therewith." Thus, the prohibition comes into play only when the prosecutor uses character as "a way station on the road to an ultimate inference of conduct in conformity with character." *Id.* at 103-04. Stated differently, Rule 404(b) expressly prohibits only one theory of logical relevance, which may be depicted as follows: the defendant's uncharged act → the defendant's subjective character, disposition, or propensity → the defendant's conduct in conformity with his or her character. *See id.* at 104. Rule 404(b) is implicated whenever the other-acts evidence has a tendency to lead the jury into this forbidden propensity inference. But that can happen from both similar and dissimilar uncharged acts. On one hand, the prosecutor might offer evidence that the defendant previously committed a crime *similar* to the charged offense, which could lead the jury improperly to infer that because she did it once, she did it again. On the other hand, the prosecutor might offer evidence that the defendant previously committed a crime *dissimilar* to the charged offense, which likewise could lead the jury improperly to infer that because she committed the previous crime, the defendant is inclined to wrongdoing or is generally a criminal and, as such, is more likely to have committed the charged offense. But in both instances, the evidence would be admissible under Rule 404(b) for a nonpropensity purpose. For example, the similar crime might be admissible to show absence of mistake

51

or accident; and the dissimilar crime (e.g., a carjacking) might be admissible to show the defendant's overall plan to use the car in the charged offense (e.g., a kidnapping), which in turn shows that he is the perpetrator of that offense and had the requisite mens rea.

¶100 Likewise, in the present case, Rule 404(b) prohibited the State from offering evidence of the spurious emails and letters, the hang-up phone calls, and the petty vandalism to prove that Stout had a bad character and acted in conformity with that character on the night in question. But Rule 404(b) allowed the State to present this evidence for another purpose, such as proof of Stout's plan. Indeed, under the State's theory in this case, these uncharged acts were all part of Stout's plan to kill Bill and escape responsibility by shifting suspicion and blame to Barbara Miller. The fact that the acts of harassment were not "similar" to the act of homicide should not have precluded the State from introducing this evidence under Rule 404(b). Whether similarity is required between the uncharged act and the charged act depends on the particular purpose for which the evidence is offered and the proponent's theory of logical relevance.[6]

---

[6] Another theory that requires similarity between the charged and uncharged acts is the doctrine of chances, which may be used to establish the defendant's intent. This doctrine teaches that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 5:06, 15-16. For example, " 'if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim or B's accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e. as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small . . . .' " *Id.* at 16-17 (quoting Wigmore, *Evidence* vol. 2, § 302 (3d ed., Little, Brown and Co.)). It should be noted that the inference of deliberate conduct under this theory is based on an objective improbability of accident, rather than a subjective probability inferred from the defendant's character. *See id.* at 17-18.

Similarity is not an inherent requirement of all purposes for which other-acts evidence might be offered, and we have muddled up our Rule 404(b) jurisprudence by suggesting in *Just*, and again in *Matt*, that Rule 404(b) only applies to or is concerned with evidence of "similar" uncharged acts. A blanket rule that other-acts evidence must always be similar to the charged act is simply incorrect and should be overruled.[7]

¶101 There also is no basis in Rule 404(b) for requiring the uncharged act to be "near in time" to the charged act in every case. With respect to plan, for example,

> [a] master criminal may devise a long-term plan including stages separated by extended periods of time and great distances. It is true that the longer the period of time, the more difficult it is to infer a nexus between the charged and uncharged crimes. But, as a matter of logical relevance analysis, it makes no sense to adopt a categorical rule that the crimes be proximate to each other.

Imwinkelried, *Uncharged Misconduct Evidence* § 3:22, 116 (footnotes omitted). Indeed, the question of whether the uncharged act is too remote in time is ultimately addressed by *Matt*'s fourth substantive requirement, which states that the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Matt*, 249 Mont. at 142, 814 P.2d at 56; *see also* M. R. Evid. 403. Thus, whether an uncharged act is truly too remote in

---

[7] At this point, the similarity requirement is largely meaningless in any event, as we have equated "similarity" with mere "relevance." *See State v. Ayers*, 2003 MT 114, ¶ 80, 315 Mont. 395, 68 P.3d 768 (" '[T]here is no rigid rule for determining when conduct is sufficiently similar[;] rather, the determination of similarity depends on whether the conduct has some relevance to prove an issue in dispute.' " (quoting *State v. Weldy*, 273 Mont. 68, 75, 902 P.2d 1, 5 (1995), in turn citing *State v. Keys*, 258 Mont. 311, 314-15, 852 P.2d 621, 623 (1993))).

time will depend on the particular purpose for which the evidence is offered and the proponent's theory of logical relevance; and if it has little probative value, relative to its prejudicial effect, it should be excluded on that basis.

¶102   When it comes to introducing other-acts evidence, it is preferable that prosecutors and courts comply with Rule 404(b), Rule 403, and the Modified *Just* Rule's procedural criteria (notice and cautionary instructions), rather than circumventing those requirements by way of § 26-1-103, MCA.  Yet, we have encouraged the latter approach by making the Modified *Just* Rule totally unworkable with respect to many legitimate Rule 404(b) purposes.  Conditioning admissibility under Rule 404(b) on the similarity and nearness in time of the uncharged acts—criteria which, it should be recalled, originated in our pre-Rule 404(b) other-crimes-or-acts caselaw—is, in many cases, legally unsupported and only encourages the intellectually dishonest approach of resorting to the largely unrestricted transaction rule in cases where Rule 404(b) clearly governs.  We therefore should jettison the first two substantive requirements of the Modified *Just* Rule and simply require the following criteria in order to admit other-acts evidence:

1.  advance notice, as required by statute (*see* § 46-13-109, MCA);
2.  compliance with Rule 404(b):  the evidence must be offered for a purpose other than to show action in conformity with character;
3.  compliance with Rule 402:  the evidence must be relevant to a material issue in light of the purpose for which it is offered;
4.  compliance with Rule 403:  the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence; and
5.  compliance with Rule 105:  the court, upon request, must restrict the evidence to its proper scope and instruct the jury that the evidence is to be considered only for the proper purpose for which it was admitted (*see also* § 46-16-401(1), MCA).

*Cf. Huddleston*, 485 U.S. at 691-92, 108 S. Ct. at 1502 (concluding that the last four of these criteria provide appropriate protection against the introduction of unduly prejudicial evidence under Rule 404(b)). This approach is faithful to our Rules of Evidence, which is certainly preferable to the arbitrary approach of *Just* and *Matt.* Furthermore, it should be noted that in meeting the second, third, and fourth of these requirements, the prosecution would have to establish the other act's similarity and nearness in time only if the prosecutor's theory of logical relevance required these showings.

### D. Summary

¶103  To conclude this discussion, Rule 404(b) applies to any uncharged act offered into evidence that has a tendency to impugn the defendant's character. Rule 404(b) does not bar the evidence as such; rather, it bars a certain theory of admissibility. Specifically, the evidence is not admissible to prove the character of a person in order to show action in conformity therewith, but it may be admissible for other logically relevant purposes that do not require an inference of the defendant's criminal disposition. In the present case, for example, evidence of Stout's harassment campaign could have been admitted (if it also satisfied Rule 403, which I believe it would have) to show plan, preparation, and identity.[8] Because the Modified *Just* Rule would have incorrectly precluded this result,

---

[8] The same is true of the evidence (unchallenged by Stout in this appeal) that the registry of Stout's personal computer showed Internet searches including "How to Kill Someone," "Poison and Get Away with It," and "How to Put a Person to Sleep," as well as the evidence that the she wrote a note, which investigators found in her nightstand, with instructions on how to fire the 9 mm pistol. While this evidence was not admissible to show that Stout had an evil character and acted in conformity with that character on the night Bill was shot, it could be introduced for some other purpose, such as evidence of

and because the Modified *Just* Rule is inconsistent with Rule 404(b)'s purpose and scope, I would revise this rule in the manner suggested above.

### III.  Section 26-1-103, MCA

¶104   Before addressing the Court's approach under the transaction rule in this case, I note two initial matters that bear on this discussion.

### A.  Inseparable, Intrinsic, or Inextricably Intertwined Acts

¶105   Various commentators discuss the notion of "intrinsic" crimes, wrongs, or acts and whether these are covered by Rule 404(b).  For instance, Professors Wright and Graham offer the example of a victim who testifies in a rape prosecution that the defendant broke into her apartment and forced her to have sexual relations at gunpoint.  *See* Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 445.  This testimony can be said to describe incidents of burglary, malicious destruction of property, assault, false imprisonment, and violations of firearms regulations.  Wright and Graham note that the common law device for dealing with the admissibility of these uncharged acts was the doctrine of "inseparable crimes," which Wigmore would have codified as follows:

> "Whenever the doing of a criminal act charged appears to have been accompanied by the doing of one or more other criminal acts, so that it is not practicable to separate them in the course of producing evidence, the other acts may be proved by virtue of the principle of Multiple Admissibility * * * but not for the purpose of using them evidentially against the defendant's moral character."

*Id.* at 446 (quoting Wigmore, *Code of Evidence,* 81 (3d ed. 1942), and citing Wigmore, *Evidence* vol. 1, § 218 (3d ed. 1940)).  Wright and Graham observe that this doctrine

---

plan, which in turn would support the legitimate inferences that she was the person who killed Bill and that she did so purposely or knowingly.

seems justifiable when used to cover such situations as where the seller of contraband must necessarily be shown to have possessed it, or where the band of robbers is shown to have seized hostages to make good their escape from the scene of the crime, but not to admit evidence that the car used in the robbery was stolen or that the defendant in a rape prosecution pilfered his victim's jewels on the way out, and certainly not to admit evidence that merely serves to "explain" the charged crime. *Id.* at 446-47.[9] Notably, Wigmore's approach seems to contemplate that proof of "inseparable" crimes is a permissible purpose for introducing uncharged misconduct evidence under Rule 404(b). Wright and Graham, however, suggest that when an uncharged act is "so interwoven with the charged crime that it is impossible to prove one without revealing the other," it is simply not an "other" crime, wrong, or act within the meaning of Rule 404(b). *Id.* at 448.

¶106   Somewhat similarly, Professor Imwinkelried explains that where the uncharged act occurred simultaneously with the charged act and the two acts are "realistically inseparable" or "indivisible" (e.g., because the witness testifying to the charged act cannot avoid mentioning the uncharged act), the uncharged act is exempt from the regular rules for the admission of other-acts evidence. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 6:30, 87-90.   Professors Mueller and Kirkpatrick, in contrast, argue that

---

[9] *See also id.* at 447 (noting that the doctrine of inseparable crimes "became completely perverted when courts began to use the infamous Latin tag 'res gestae' to describe the rule"); *id.*, 2010 Supp., 569 n. 96 (noting that some courts have distorted the "unit of criminality" concept in ways that make the restrictions on other-acts evidence "of little moment"—not unlike this Court's approach in the present case, where the homicide, the spurious emails and letters, the hang-up phone calls, and the petty vandalism have all been deemed to be part of a single "transaction," rather than the distinct charged act (homicide) and uncharged act (harassment campaign) they are).

"putting proof of inseparable crimes beyond reach of [Rule 404(b)] is unwise and wrong." Mueller & Kirkpatrick, *Federal Evidence* § 4:33, 818. Still, they acknowledge that when proof of the charged offense "cannot avoid" revealing an "inextricably intertwined" uncharged act, it makes sense enough to say that the uncharged act is not an "other" crime, wrong, or act under Rule 404(b). *See id.* at 815, 818. Thus, for example, an eyewitness would be allowed to testify that the defendant struck the teller in the course of demanding the money, even though the defendant was not charged with assault or battery. *See id.* at 817-18.

¶107 Professor Leonard discusses the notion of "intrinsic" or "inextricably intertwined" acts at some length. *See* Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, ch. 5. Ultimately, he concludes that the use of these terms "invites sloppy, nonanalytical decision-making." *Id.*, § 5.2, 327. He argues that "describing uncharged misconduct as either 'intrinsic' or 'extrinsic' neither provides a predictable way to determine admissibility nor conduces to the sort of analysis that needs to be undertaken to determine admissibility." *Id.* at 330. Indeed, he notes that courts which follow this approach "often fail to take seriously the dangers associated with misconduct evidence," *id.*, § 5.4, 365, and "have lost sight" of the purposes of the limitations on the admissibility of such evidence, *id.*, § 5.2, 327. Leonard suggests that courts should approach intrinsic or inextricably intertwined evidence in the same way they approach extrinsic evidence: "by measuring its probative value for a legitimate purpose and comparing that value to the tendency of the evidence to cause unfair prejudice." *See id.*, § 5.1, 320, § 5.2, 330. In effect, all other-acts evidence would be subject to analysis

under Rule 404(b) and Rule 403, regardless of whether it is categorized as "intrinsic" or "extrinsic."

¶108   The courts in *United States v. Taylor*, 522 F.3d 731 (7th Cir. 2008), and *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000), also take a dim view of the intrinsic/extrinsic distinction and the "inextricably intertwined" formula, characterizing the latter as "unhelpfully vague." *Taylor*, 522 F.3d at 734; *accord Bowie*, 232 F.3d at 928.  They note that in one respect the standard is circular ("inextricably intertwined evidence is intrinsic, and evidence is intrinsic if it is inextricably intertwined"), while in another respect it is overbroad ("[t]he 'complete the story' definition of 'inextricably intertwined' threatens to override Rule 404(b)").  *Bowie*, 232 F.3d at 928; *Taylor*, 522 F.3d at 734.  Furthermore, the standard's vagueness, in turn, "invites prosecutors to expand the exceptions to [Rule 404(b)] beyond the proper boundaries of the exceptions," *Taylor*, 522 F.3d at 734, and creates "a danger that finding evidence 'inextricably intertwined' may too easily slip from analysis to mere conclusion," *Bowie*, 232 F.3d at 928.  The critical problem with this approach, of course, is that "treating evidence as inextricably intertwined not only bypasses Rule 404(b) and its attendant notice requirement, but also carries the implicit finding that the evidence is admissible for all purposes notwithstanding its bearing on character, thus eliminating the defense's entitlement, upon request, to a jury instruction." *Bowie*, 232 F.3d at 928.  The *Taylor* and *Bowie* courts acknowledge that in "a narrow range of circumstances," the evidence of the charged crime may "unavoidably reveal" the uncharged act, but they conclude that most

59

"inextricably intertwined" evidence properly can and should be admitted pursuant to Rule 404(b). *See Taylor*, 522 F.3d at 734-35; *Bowie*, 232 F.3d at 929.

¶109 There seems to be, then, a general recognition that in some situations, proof of the charged act will unavoidably reveal an uncharged act because the uncharged act is so interwoven with the charged act that it is simply impossible to separate them in the course of producing evidence. And much of the controversy, in turn, appears to center on whether the "inextricably intertwined" formula is an appropriate standard for determining if the uncharged act falls into this category. Professor Leonard and the *Taylor* and *Bowie* courts make persuasive arguments for rejecting the "inextricably intertwined" test; however, the fact is that in Montana we have a statute on the books (§ 26-1-103, MCA) that must be given whatever limited meaning it deserves relative to Rule 404(b), and I recently agreed with the Court that the "inextricably intertwined" formula is an appropriate standard for applying this statute.[10] *See State v. Guill*, 2010 MT 69, ¶¶ 49-55, 355 Mont. 490, 228 P.3d 1152 (Nelson, J., concurring). Moreover, I believe that the problem is not so much the standard itself as it is this Court's repeated manipulations of it in order to reach the desired result in the given case. Rather than continue that approach, we instead should revise the Modified *Just* Rule in the manner suggested above to make Rule 404(b) more accessible and require that all but a very narrow category of other-acts evidence be admitted pursuant to the rule as revised. As suggested by our decision in

---

[10] The statute states, in full: "Declaration, act, or omission which is a part of the transaction. Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA.

*Guill* (discussed in Section C below), the authorities cited above, and the language of § 26-1-103, MCA, I would limit the transaction rule to uncharged crimes, wrongs, or acts that truly cannot be separated from the charged act in the course of producing evidence.

### B. The Attorney General's Double Standard

¶110 In this connection, the State argues for an exceptionally broad interpretation of the transaction rule in this case. Specifically, the State takes the position that evidence of "the Barbara Miller Story" was admissible under the transaction rule because Bill's death "left perplexing circumstances that required explanation." Although the State recognizes that this evidence was admissible for a variety of Rule 404(b) purposes—to establish the perpetrator's "identity" and "motive," and to show that Stout engaged in a long-term and persistent "preparation or planning" of her husband's murder—the State maintains that the evidence was properly admitted instead as transaction evidence under § 26-1-103, MCA, to "explain the puzzling circumstances" of Bill's death and answer the "stupefying question" of "why" he died and "who" killed him—basically, "to complete the story of murder." Thus, under the State's theory in *this* case, which the Court adopts wholesale, evidence that is merely explanatory of some facet of the charged offense—that answers the "who" or the "why" of the crime, that explains any "puzzling circumstances" in the case, or that "completes the story"—is admissible under the transaction rule, even if (as here) the evidence falls squarely within the parameters of Rule 404(b) and even if (as here) the evidence is of separate incidents that occurred years earlier.

¶111 However, notwithstanding this broad interpretation, the State takes the position in *State v. Henson* (No. DA 09-0189), 2010 MT 136, ___ Mont. ___, ___ P.3d ___, that the

61

transaction rule should be interpreted very narrowly so as not to allow evidence of uncharged acts merely for contextual purposes, particularly if the acts were "separate incidents at different times and places." *See* Brief of Appellee at 19-22. In *Henson*, the defendant (Henson) raised the defense of justifiable use of force in the shooting death of Larry Kingsley; and in order to prove that defense, she sought (unsuccessfully) under the transaction rule to introduce "contextual evidence" of Kingsley's hostile interactions with various persons on the day of his death and during the weeks preceding his death. On appeal, Henson argues that the district court erred in excluding this evidence because Kingsley's interactions were "vital to context" and "provided an explanation for behavior which was out of the ordinary." In other words, she claims the evidence was admissible to explain "why" she shot Kingsley: "Without access to Kingsley's continuing and escalating pattern of bizarre and threatening conduct, it was difficult for Henson to provide the jury with an explanation of the bizarre and threatening situation in which she found herself with Kingsley." Henson asserts that evidence of Kingsley's prior conduct "was necessary for the jurors to evaluate Kingsley's death in its true and full context." *See* Brief of Appellant at 17-23; Reply Brief of Appellant at 8-10.

¶112 Thus, the Attorney General's Office now finds itself, ironically, having to defend against the broad interpretations of the transaction rule which it has argued, and this Court has adopted, in previous transaction rule cases. Indeed, Henson finds support for her argument in *State v. McLaughlin*, 2009 MT 211, ¶ 20, 351 Mont. 282, 210 P.3d 694 (evidence that "provides context to the criminal act" and "serve[s] to explain" why the defendant would engage in the conduct in question is admissible under the transaction

rule), *State v. Mackrill*, 2008 MT 297, ¶¶ 42-43, 345 Mont. 469, 191 P.3d 451 (evidence of "the context in which the criminal act occurred" is admissible under the transaction rule), and *State v. McCaslin*, 2004 MT 212, ¶ 34, 322 Mont. 350, 96 P.3d 722 (evidence illustrating the defendant's behavior subsequent to his arrest is admissible under the transaction rule "in order to provide context to the criminal act"). As Justice Rice notes in his *Henson* concurrence, Kingsley's threatening interactions are similar to the incidents we affirmed under the transaction rule in *Mackrill* and *McCaslin*. *Henson*, ¶ 39 (Rice, J., concurring). Moreover, Henson's argument certainly would prevail under the standard articulated by the Court today. *See* Opinion, ¶ 45 (evidence that "provide[s] the essential context to prove to the jury how and why the crime occurred" is admissible under the transaction rule). And it likewise would satisfy the "why" standard argued by the State in the present case.

¶113 Yet, despite advocating for that broad interpretation of the transaction rule in this case, and despite arguing that classic Rule 404(b) evidence is admissible under the transaction rule in this case, the Attorney General hypocritically argues in *Henson* that there is a "distinction" between transaction rule evidence and Rule 404(b) evidence and that "[t]he transaction rule should not be expanded to the point that the prohibition of character evidence under Rule 404(b) is swallowed."[11] Furthermore, in an even greater

---

[11] As support for this proposition, the State cites *State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776, which in turn cites my special concurrence in *State v. Crosley*, 2009 MT 126, ¶ 67, 350 Mont. 223, 206 P.3d 932, where I argued (presciently) that if this Court did not rein in its ever-expanding pronouncements concerning the scope of the transaction rule, the rule would completely swallow the Modified Just Rule and Rule 404(b)'s general prohibition against character evidence.

display of chutzpah, the Attorney General contends that the transaction rule is reserved for prosecutors to prove a defendant's prior bad acts and is not available to defendants to prove the acts of a third party. Defendants, rather, must follow "the applicable rules of evidence"—an assertion which prompted Henson to respond that, "[i]n essence, the State argues that what is good for the gander is not good for the goose." In point of fact, the double standard proffered by the Attorney General has absolutely no support in the language of § 26-1-103, MCA.

¶114 The State's inconsistent positions in *Henson* and the present case are disingenuous, if not outright duplicitous.[12] And the State's double standard is all the more mind-boggling in light of its recent recognition in *State v. Knowles* (No. DA 09-0558) that "the 'role of the prosecutor is special—it is not to act as a zealous advocate, rather it is to protect the rights of citizens, including citizens accused of crime.' " Brief of Appellee at 18 (quoting *State v. Duffy*, 2000 MT 186, ¶ 19, 300 Mont. 381, 6 P.3d 453, in turn citing Rule 3.8 of the Montana Rules of Professional Responsibility). Nevertheless, it must be acknowledged that the State was able to find support for its differing arguments (here and in *Henson*) in the widely varying statements this Court has made in its discussions of the transaction rule in past cases.[13] Indeed, the blame for the morass of conflicting rules and standards falls squarely on the shoulders of this Court,

---

[12] If the Attorney General's Office wants to argue for a broad interpretation of the transaction rule, as they have done in case after case, that is their business. But they should be expected and required to live with that interpretation. To suddenly adopt the position that the transaction rule should be construed narrowly just because it is the defendant who is invoking it is, in my view, intellectually dishonest.

[13] Before *Henson*, however, we have never held that the transaction rule is a privilege available only to prosecutors.

64

which continually applies the transaction rule in an inconsistent, confusing, and ad hoc manner. The State's arguments in *Henson* and the present case show that it is possible to argue diametrically opposing views regarding the breadth and use of the transaction rule in two separate cases and to support those opposing views with citations to this Court's cases. The problem is that, with very few exceptions, we routinely pay lip service to the "inextricably linked" requirement and then affirm the admission of the evidence at issue because it is "evidence of the crime" or "provides context" or is "explanatory of" something in the case. Today's decision is yet another example of this approach.

### C. The Court's Decision

¶115 Indeed, turning to the Court's decision, we recently clarified the purpose of the transaction rule and the exacting requirements for admitting evidence under § 26-1-103, MCA, in *Guill*. We explained that "[t]he rationale for admitting transaction evidence is, first, that it is theoretically difficult to subdivide a course of conduct into discrete criminal acts and 'other' conduct and, second, practically speaking it is difficult for a witness to testify coherently to an event if the witness is only permitted to reference the minutely defined elements of the crime." *Guill*, ¶ 27 (citing Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 446). Thus, based on the "confluence of our recent jurisprudence, practicality, and persuasive authority," we held that to be admissible under the transaction rule, the evidence in question must be "inextricably linked to" or "inextricably intertwined with" a fact in dispute. *See Guill*, ¶¶ 25-30, 36, 42, 45.

¶116 The Court acknowledges the "inextricably linked" standard as controlling in the present case. Opinion, ¶¶ 38, 41. The plain and undisputed meaning of "inextricable" is

65

"incapable of being disentangled or untied." *Merriam-Webster's Collegiate Dictionary* 597 (10th ed., Merriam-Webster 1997). Hence, the evidence—or, more precisely, the factual matter the proponent seeks to prove with the evidence—must be so entangled or interwoven with a fact in dispute that it is simply impossible to separate them in the course of producing evidence. *See Guill*, ¶ 27; *Taylor*, 522 F.3d at 734; Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 446, 448. Here, Stout was charged with purposely or knowingly causing Bill's death, and the State produced evidence that she was alone with him at the time he died; that Bill was shot in the back of the head; that he was found in his bed; that the gun was found in the saddlebag of his motorcycle in the garage (thus undercutting any suicide theory); that the lights were on in the bedroom area of the house in the middle of the night (which neighbors said was unusual); that Stout stood to recover a $500,000 life insurance benefit and the home with over $500,000 in equity; that the ammunition box had been made to look like it was still full; that investigators found an unfinished laundry-washing project containing wet clothes, smelling strongly of bleach, in the laundry hamper; and that investigators also found in the same laundry hamper a latex glove, which contained Stout's DNA on the inside and imbedded gunshot residue on the outside. It was by no means impossible, or even difficult, to present this evidence without also revealing that Stout had stalked her family and friends during the years prior to Bill's death. More to the point, it was practicable for the State's witnesses to testify as to the events of the night in question and the physical evidence described above without having to reveal the various uncharged acts comprising Stout's harassment campaign. The spurious emails and letters, the

hang-up phone calls, and the acts of petty vandalism were all "other crimes, wrongs, or acts" covered by Rule 404(b), not § 26-1-103, MCA.

¶117  Hence, if the Court applied the "inextricably linked" standard true to its meaning, then it would be necessary to reverse Stout's conviction and remand for a new trial. But instead, the Court perversely twists the meaning of "inextricably linked" to broadly encompass any factual matter that is "evidence of the crime" or that serves to "complete the picture" or "provide essential context" of the offense. Opinion, ¶¶ 38, 45. This manipulation shows that this Court " 'understand[s] as well as the next court how to . . . articulate the correct legal principle, and then perversely fit into that principle a set of facts to which the principle obviously does not apply.' " *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 500, 113 S. Ct. 2711, 2742 (1993) (O'Connor, White, & Souter, JJ., dissenting) (ellipsis in *TXO Prod.*) (quoting *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 907 (W.Va. 1991)). Indeed, the Court deftly demonstrates that it can " 'mouth the correct legal rules with ironic solemnity while avoiding those rules' logical consequences.' " *Id.* (quoting *Garnes*, 413 S.E.2d at 907). I cannot agree with this sort of decision-making. "[C]ourts must do more than recite the [applicable] rule. They also must apply it, faithful to its letter and cognizant of the principles underlying it." *Id.* at 500, 113 S. Ct. at 2741-42.

¶118  Setting aside the Court's utter distortion of the "inextricably linked" standard, the fundamental error in the Court's approach is its mistaken premise that Rule 404(b) is not implicated where the uncharged act is "evidence of the crime." Here, for example, the Court reasons that (1) Stout's efforts to paint Miller as a deranged stalker and murder

67

suspect were an integral part of Stout's plan to kill Bill, (2) evidence of the defendant's

planning of the crime is evidence of the crime itself and not evidence of an "other" crime,

wrong, or act, and (3) Rule 404(b), therefore, is not implicated. Opinion, ¶ 45. This

conception of Rule 404(b) is patently erroneous. First of all, the crime with which Stout

was charged was deliberate homicide, and nowhere in the definition of this offense does

the word "plan" appear. *See* § 45-5-102(1)(a), MCA ("A person commits the offense of

deliberate homicide if the person purposely or knowingly causes the death of another

human being."). Hence, the evidence that Stout manufactured the harassment campaign

to implicate Miller was most definitely evidence of an "other" crime, wrong, or act.[14]

Second, as explained above, Rule 404(b) is implicated whenever the proffered evidence

has a tendency to impugn the defendant's character. Whether the evidence can be

categorized as "evidence of the crime" is wholly beside the point. Rule 404(b) is a rule

of admissibility—more specifically, a narrow restriction on otherwise relevant evidence:

evidence of other crimes, wrongs, or acts cannot be introduced to prove action in

conformity with character, but it can be introduced for any logically relevant purpose that

does not require an inference of the defendant's criminal disposition. This rule applies

---

[14] The "actus reus" of a crime is "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability; a forbidden act <the actus reus for theft is the taking of or unlawful control over property without the owner's consent>." *Black's Law Dictionary* 37 (Bryan A. Garner ed., 7th ed., West 1999). Here, the actus reus was causing Bill's death. Section 45-5-102(1)(a), MCA (deliberate homicide). It was not causing her family and friends substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly harassing, threatening, or intimidating them with spurious emails and letters, hang-up phone calls, and acts of petty vandalism. Section 45-5-220(1), MCA (stalking). These latter acts were "other" crimes, wrongs, or acts offered as evidence of plan, preparation, and identity in order to prove the charged homicide.

regardless of whether the evidence is "evidence of the crime"; and, in point of fact, evidence of uncharged misconduct offered under Rule 404(b) is typically "evidence of the crime." Indeed, that is the whole purpose of offering evidence of an uncharged act: to establish the defendant's motive, plan, preparation, opportunity, etc., which in turn tends to prove that she committed the charged offense. *See* Weinstein & Berger, *Weinstein's Federal Evidence* § 404.20[1], 404-39 (although other-acts evidence is not admissible to show character in order to prove conduct, such evidence is admissible "to show other facts that may be in issue," including "a consequential fact, such as intent or knowledge," or "a proposition, such as motive, that through a series of inferences may tend to establish the probability of a consequential fact"). In the present case, for example, the harassment campaign was evidence of Stout's intent (her purpose and knowledge) and her identity as the person who caused Bill's death. Lastly, there is no logical basis, let alone legal authority, for the Court's proposition that all "evidence of the crime" is part of the "transaction" and, as such, is admissible under § 26-1-103, MCA. As the *Bowie* court quite correctly pointed out, "it cannot be that all evidence *tending to prove* the crime is *part of* the crime. If that were so, Rule 404(b) would be a nullity." *Bowie*, 232 F.3d at 929 (emphases added).

¶119 The Court contends that there are clear difficulties determining "the line to be drawn between the evidence without which the conviction could not occur and all other evidence offered by the prosecution." Opinion, ¶ 47. That may be true, but it is not the approach I am suggesting. Rather, my argument is that in order to give independent meanings to Rule 404(b) and § 26-1-103, MCA, as we are required to do (*see* ¶ 82,

69

*supra*), we must draw a line between "other" acts and "inextricably linked" acts as the latter term is defined in *Guill* and the authorities discussed in ¶¶ 105-109 above. This is not to suggest that we should exclude a broader range of other-acts evidence in criminal trials. To the contrary, I believe that such evidence is routinely admissible, but under Rule 404(b)—which, it should be recalled, is open-ended with respect to the logically relevant, nonpropensity purposes for which such evidence may be offered. My position is that we should apply Rule 404(b) to the vast majority of other-acts evidence and that § 26-1-103, MCA, should apply to only a very narrow category of such evidence. I recognize this would require prosecutors to give notice of other-acts evidence more often, and it may require trial courts to instruct the jury on the use of such evidence in more cases. But I believe this is the better, and not unduly burdensome, approach. It will ensure that the parties and the courts are actually engaging in a critical analysis of the purpose for which the evidence is being offered; it will ensure that the balancing of Rule 403 is conducted; and it will protect the defendant's right to a fair trial—none of which are specifically required by our jurisprudence under the transaction rule.[15] Granted, our current Modified *Just* Rule is largely unworkable, and I do not suggest that prosecutors should be required to regularly comply with that rule as currently written. That is why I am suggesting we revise the rule in the manner set out above (*see* ¶ 102, *supra*) and then

---

[15] Evidence that is admissible under the transaction rule is still subject to balancing under Rule 403. *See e.g. State v. Detonancour*, 2001 MT 213, ¶¶ 29-32, 306 Mont. 389, 34 P.3d 487; *accord Guill*, ¶ 26; *see also* M. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). However, we have not been consistent in requiring such balancing as a matter of course.

require compliance with § 46-13-109, MCA, and Rules 404(b), 402, 403, and 105 in most cases.

¶120 The Court issues two directives regarding compliance with the Rules of Evidence. Unfortunately, however, these directives ring hollow. On one hand, the Court cautions that the transaction rule "should not be used to avoid Rule 404 and the notice and instruction requirements it specifies," Opinion, ¶ 39, and that "the prosecutor is required to conform to the Montana Rules of Evidence," Opinion, ¶ 46, two statements with which I completely agree. Yet, on the other hand, the Court ratifies the very conduct it has cautioned against: the prosecutor's action in the present case of using the transaction rule to avoid Rule 404(b) and its notice and instruction requirements.[16] Cautions, warnings, and directives have little meaning when there are no consequences for ignoring them; and the message we are sending today is that our seeming directives—such as those in ¶¶ 39 and 46 of today's Opinion and in ¶ 46 of *State v. Berosik*, 2009 MT 260, 352 Mont. 16, 214 P.3d 776—are nothing more than aspirational requests.

¶121 As a final matter, while it is frustrating that the Court has completely distorted the meaning of "inextricably linked" for purposes of the present case, it is even more troubling that the Court has adopted a double standard under which the State may use the

_____

[16] It does not appear that the Ravalli County Attorney's Office even attempted to comply with the Modified *Just* Rule in this case. The Deputy County Attorney declared on the Omnibus Hearing Memorandum that the prosecution did not intend to introduce evidence of other crimes, wrongs, or acts under Rule 404(b). But then, subsequently, he invoked the transaction rule to introduce evidence that Stout had "stalked" her family, claiming that this evidence was admissible "as part of the complete transaction of events leading up to killing Bill Stout." He explained that the evidence tended to prove Stout's "intent" and would show that she had a long-term "plan" to kill Bill and put the blame on Barbara Miller—both of which are Rule 404(b) purposes.

transaction rule to provide "the essential context to prove to the jury how and why the crime occurred," Opinion, ¶ 45, but defendants are denied that very same use of the rule, *Henson*, ¶ 26. The Court's approach is not only patently unfair, but also of dubious legal validity. *See People v. Cruz*, 643 N.E.2d 636, 654 (Ill. 1994) ("[T]here is a distinction between the limits imposed on a defendant's use of other-crimes evidence to exculpate himself and the State's use of such evidence to prosecute him."); Imwinkelried, *Uncharged Misconduct Evidence* vol. 2, § 10:43, 114 ("[T]he standard for admitting third party's misdeeds to exculpate the defendant should be less stringent than the test for admitting the defendant's uncharged misconduct.").

## CONCLUSION

¶122 For the reasons just discussed, I strenuously disagree with the Court's analysis under § 26-1-103, MCA. I believe that our decision will only encourage further abuse of the transaction rule. Indeed, under the Court's holding that "evidence of the crime" satisfies the "inextricably linked" standard, the transaction rule has, for all practical purposes, finally swallowed Rule 404(b). *See Bowie*, 232 F.3d at 929 ("[I]t cannot be that all evidence *tending to prove* the crime is *part of* the crime. If that were so, Rule 404(b) would be a nullity." (emphases added)). Moreover, because the Court holds in this case that the State may use evidence of uncharged misconduct to convict a defendant—although notice of this evidence was not given under § 46-13-109, MCA; although this evidence was not analyzed to ensure a nonpropensity purpose under Rule 404(b); although this evidence was not subjected to balancing under Rule 403; and although cautionary instructions were not given pursuant to Rule 105 and § 46-16-401(1),

72

MCA—defendants will have to pursue federal due process claims in order to protect their right to a fair trial. *See Burden v. Zant*, 903 F.2d 1352, 1363 (11th Cir. 1990) (habeas relief justified if the admission of other-crimes evidence deprived the defendant of fundamental fairness and due process of law).

¶123 There is a better approach, however—one that will facilitate the introduction of other-acts evidence while protecting against unfair prejudice and misuse of that evidence by the fact-finder. Indeed, the repeated battles in the trial courts and this Court over the scope of the transaction rule should come to a welcome end. Specifically, as explained above (*see* ¶¶ 93-102, *supra*), I suggest that we revise the Modified *Just* Rule to contain the following five criteria:

1. advance notice, as required by statute (*see* § 46-13-109, MCA);
2. compliance with Rule 404(b): the evidence must be offered for a purpose other than to show action in conformity with character;
3. compliance with Rule 402: the evidence must be relevant to a material issue in light of the purpose for which it is offered;
4. compliance with Rule 403: the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence; and
5. compliance with Rule 105: the court, upon request, must restrict the evidence to its proper scope and instruct the jury that the evidence is to be considered only for the proper purpose for which it was admitted (*see also* § 46-16-401(1), MCA).

This approach does nothing more than require compliance with the applicable statutory provisions and Rules of Evidence. Evidence of uncharged misconduct is often highly probative, as in this case, but also inherently prejudicial. Yet, as the Supreme Court noted, Rules 404(b), 402, 403, and 105 provide the necessary protection against the

introduction of *unduly* prejudicial uncharged misconduct evidence. *See Huddleston*, 485 U.S. at 691-92, 108 S. Ct. at 1502.

¶124   In closing, I would reverse and remand for a new trial under Issue Two. I thus would not address the other issues raised by Stout on appeal. I disagree with the Court's contrary decision.

¶125   I dissent.

/S/ JAMES C. NELSON